**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TROY ARDEN JULIAR, Individually And On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>SUNOPTA, INC., STEVEN BROMLEY, JOHN H. DIETRICH, and STEPHEN R. BRONFMAN,<br><br>     Defendants. | **CASE NUMBER: 08-CV-00933**<br><br>**JUDGE PAUL A. CROTTY** |
| STEPHEN STRUGALA, Individually And On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>SUNOPTA, INC., STEVEN BROMLEY, JOHN H. DIETRICH, and STEPHEN R. BRONFMAN,<br><br>     Defendants. | **CASE NUMBER: 08-CV-01070**<br><br>**JUDGE PAUL A. CROTTY** |
| RAY FOSTER, Individually And On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>SUNOPTA, INC., STEVEN BROMLEY, JOHN H. DIETRICH,<br><br>     Defendants. | **CASE NUMBER: 08-CV-01313**<br><br>**JUDGE PAUL A. CROTTY** |

|  |  |
|---|---|
| ROGER DAVIDSON, Individually And On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>SUNOPTA, INC., STEVEN BROMLEY, JOHN H. DIETRICH, )<br><br>Defendants. ) | **CASE NUMBER: 08-CV-01496**<br><br>**JUDGE PAUL A. CROTTY** |
| MARIE LORENZATO, Individually And On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>SUNOPTA, INC., STEVEN BROMLEY, JOHN H. DIETRICH, )<br><br>Defendants. ) | **CASE NUMBER: 08-CV-01844**<br><br>**JUDGE PAUL A. CROTTY** |
| ROBERT KNOX, Individually And On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>SUNOPTA, INC., STEVEN BROMLEY, JOHN H. DIETRICH, and STEPHEN R. BRONFMAN, )<br><br>Defendants. ) | **CASE NUMBER: 08-CV-02034**<br><br>**JUDGE PAUL A. CROTTY** |

|  |  |
|---|---|
| ALBERT HALEGOUA, Individually And On Behalf of All Others Similarly Situated,<br><br>                                  Plaintiff,<br><br>       vs.<br><br>SUNOPTA, INC., STEVEN BROMLEY, JOHN H. DIETRICH, and STEPHEN R. BRONFMAN,<br><br>                                  Defendants. | )<br>)<br>)<br>)   **CASE NUMBER: 08-CV-02910-UA**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**REPLY MEMORANDUM IN SUPPORT OF THE SUNOPTA INVESTORS GROUP MOTION TO CONSOLIDATE RELATED ACTIONS; TO BE APPOINTED LEAD PLAINTIFF; AND TO APPROVE PROPOSED LEAD PLAINTIFF'S CHOICE OF COUNSEL AND IN FURTHER OPPOSITION TO COMPETING MOTIONS**

**I.     INTRODUCTION**

Of the seven related securities class actions filed on behalf of purchasers of SunOpta, Inc. ("SunOpta" or the "Company") common stock, currently, only two groups of movants seek appointment as Lead Plaintiff.[1] Of these competing movants, the SunOpta Investors Group ("SIG") is the "most adequate plaintiff" because it has the largest financial interest among the competing movants and it alone satisfies the typicality and adequacy prongs of Section 21D(a)(3)(B) of the Private Securities Litigation Reform Act ("PSLRA"), as discussed herein.

**II.    ARGUMENT**

**A.     SIG is the Presumptive Lead Plaintiff Who Has Suffered The Largest Loss**

The overwhelming majority of courts in this Circuit and elsewhere that have considered the selection and appointment of lead plaintiffs in class actions brought under the PSLRA have appointed small cohesive groups with no pre-existing relationship. These Courts have allowed the aggregation of losses for the purposes of lead plaintiff selection. *See In re Espeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 99 (S.D.N.Y. 2005) (the "majority view" in this Circuit is that "unrelated investors may aggregate"); *Weltz v. Lee*, 199 F.R.D. 129, 132 (S.D.N.Y. 2001) (aggregating losses of seven unrelated investors).

Unlike the Pension Fund group, which has failed to demonstrate any cohesiveness, SIG is a small, cohesive and unified group that has *already* demonstrated its independence and commitment to monitor and manage this litigation. Moreover, as demonstrated to this Court previously in sworn declarations submitted in connection with its motion, SIG has *already* adopted an internal structure to assure cohesiveness and manageability - - two prime concerns of the courts in appointing lead plaintiff groups. *See, e.g., Montoya v. Mamma.com Inc.*, 2005 U.S.

---

[1] As submitted to this Court previously in its opening motion, SIG has moved for consolidation of these related actions. No movants oppose consolidation.

Dist. LEXIS 10224, *7-8 (S.D.N.Y. May 31, 2005).[2]  Most importantly, SIG is also the movant with the largest financial interest in the relief sought by the Class, so it alone is entitled to the presumption afforded the most adequate lead plaintiff.

While the Pension Funds group urges the Court to adopt the "four-factor" test from *Lax v. First Merchants Acceptance Corp.*, 1997 U.S. Dist. LEXIS 11866 (N.D. Ill. 1997), its application of this purported test is improper.  First, the Pension Funds group ignores the recent Supreme Court decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), stating that losses must be proximately related to defendants' alleged misconduct and, second, it adopts an incomplete loss calculus and utilizes an improper LIFO analysis to calculate and compare losses.

While the Pension Funds group argues that it has the largest financial interest in the relief sought by the Class, it has totally ignored the fact that WWLE's losses do *not* relate to defendants' alleged illegal conduct.  As stated recently by the Supreme Court in *Dura*, "*if . . . the purchaser sells the shares.... before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.*"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).[3]

Here, WWLE has no losses related to the conduct that it alleges was improper and illegal because it sold all of its SunOpta shares in the period *immediately prior* to the Company's January 24, 2008 corrective disclosure.  According to the trade-data it supplied, WWLE sold 6,275 shares on 1/17/08; 18,550 shares on 1/23/08; and an additional 16,125 shares on 1/24/08. Rec. Doc. no. 19-2 (Loss Chart).  These sales - which consisted of WWLE's entire SunOpta

---

[2] As identified previously, the Pension Funds group consists of the Western Washington Laborers-Employers Pension Trust ("WWLE") and the Operating Engineers Construction Industry and Miscellaneous Pension Fund ("OECI").

[3] This is not a case involving partial corrective disclosures. *See, Weiss v. Friedman Billings Ramsey Group, Inc.*, 2006 U.S. Dist LEXIS 3028 (S.D.N.Y. Jan. 25, 2006).

position – occurred *immediately prior* to publication of the Company's earnings release on 1/24/08 and before the collapse of SunOpta shares the following day.

Moreover, having lost this exact same issue when litigated a year ago in the Eastern District of New York in *In Re Comverse Technology Sec. Litig.*, 2007 U.S. Dist. LEXIS 14878 (E.D.N.Y. March 2, 2007), it is surprising that the Coughlin firm, Pension Funds group's counsel, would seek to advance the same argument here. In rejecting the application by the movant represented by the Coughlin firm, the *Comverse* Court refused to acknowledge non-recoverable losses in the calculation and comparison of relative financial interests, stating:

> Before calculating plaintiff's financial interest, the Court must first determine what portion, if any, of a plaintiff's losses constitute potential recoverable losses for purposes of a necessary PSLRA/Olsten-Lax analysis. And **_under Dura, failure to demonstrate loss causation constitutes a fatal flaw that necessitates removing those losses from the financial interest calculation_**.   *Id.* at *16, n.6.

Once WWLE's purported loss of $129,101.00 is subtracted from the Pension Fund group's overall purported loss, the remainder is only the $210,993 loss attributed to OECI. This loss, however, is materially smaller than the $241,708 in demonstrable losses presented by SIG. As such, it is SIG - - *not* the Pension Funds group - - that is the presumptive lead plaintiff in this action. In fact, subtracting WWLE's losses from the Pension Funds' losses makes this group materially smaller than SIG when measured under the *Olsten-Lax* factors, as evidenced below:

| Movant | Factor 1: Shares Purchased | Factor 2: Net Shares Purchased[4] | Factor 3: Net Funds Expended | Factor 4: Approximate Loss |
|---|---|---|---|---|
| **SIG** | 44,300 | 44,300 | $504,224 | $ 241,708 (FIFO)<br>$ 241,708  (LIFO) |
| **Pension Funds Group (Without WWLE)** | 31,500 | 31,500 | $ 387,708 | $ 210,993 (FIFO)<br>$ 210,993 (LIFO) |

---

[4] As the Court endorsed in *Comverse*, "Net Shares" are shares "retained through the disclosures."

3

The Pension Funds' attack on SIG's losses is to no avail.  After agreeing in Exhibit A of the Rosenfeld Declaration that SIG group member Larry Mages' FIFO losses are $87,419.00, Rec. Doc. no. 24-1 (Loss Comparison Chart), it is wholly improper for the Pension Funds group to then fully disregard these losses from any financial interest analysis.[5]  *See*, Rec. Doc. no. 23 (Mem. in Oppn. at 3).  It is also wholly improper for the Pension Funds group to miscalculate movant Mages' purported LIFO losses by manipulating FIFO.  In fact, the Pension Funds group did not apply LIFO according to standard accounting principles, which would preclude the illogical result of matching later purchases to earlier sales -- so that shares already sold would not be compared to shares not yet purchased.  This irrational application of LIFO has no support in accounting literature, nor does it support a claim here.

The correct application of LIFO matches the sale of shares to the most recent purchase of shares ***occurring prior to the sale.  "A purchase can only be matched to a subsequent sale."***  *See,* Decl. of Ken Kotz, V. P. Forensic Economics, Inc. at ¶ 36 (submitted originally in *In re Comverse Sec. Litig.,* 2007 U.S. Dist. LEXIS 14878 (E.D.N.Y. March 2, 2007)), a copy of which is submitted as Exh. A to the K. Miller Decl. in Support of the SIG Reply Memorandum, filed herewith.  This precise point has been adopted in *SEC v. Commonwealth Chemical Securities, Inc.*, in which LIFO was defined as "the proceeds of a sales transaction [that] are matched against the price paid in the purchase transaction *just preceding the sale*."  1976 U.S. Dist. LEXIS 12998 at *3 (S.D.N.Y. 1976) (emphasis added).

Apart from stating that LIFO is a "methodology favored in this district," Rec. Doc. no. 23 (Mem. in Oppn. at 3 n.5), the Pension Funds group fails to explain why purchased shares would

---

[5] After using only FIFO to calculate losses in its initial moving papers, in its Mem. in Oppn. the Pension Funds group suddenly finds that FIFO losses should be ignored and only LIFO losses analyzed.

4

be matched against anything other than the subsequent sale of those shares. The Pension Funds group cites no case to support its position that LIFO allows a movant to treat an obvious covering transaction of a pre-existing position as a "short sale" to calculate financial interest.[6]

Again, it is surprising that the Coughlin firm was not aware of the proper LIFO methodology, after Judge Garaufis clearly stated in *In re Comverse Technology Sec. Litig.* that he found it "inexplicable" how they could utilize a purported LIFO analysis that matched earlier sales to later purchases. "It appears that [the Coughlin movant's] new calculation inexplicably matches sales of shares from 2001 with purchases of shares that occurred years later in 2006." *In Re Comverse Technology Sec. Litig.*, 2007 U.S. Dist. LEXIS 14878 at *26 (E.D.N.Y. March 2, 2007). *See*, P&P movant's LIFO presentation supporting documentation (submitted originally in *In re Comverse Sec. Litig.,* No. 06-1825, Rec. Doc. no. 56-1 (E.D.N.Y.)), Exh. B to the K. Miller Decl. in Support of the SIG Reply Memo, filed herewith.

As demonstrated previously in the SIG loss chart, attached as Exhibit A to Miller Decl., Rec. Doc. 12-1, because Mr. Mages' 9/11/07 sales relate to purchases that occurred before the Class Period and prior to his purchases on 9/13/07, such sales are irrelevant to the LIFO analysis. The same way these shares do not add to losses, they also do not decrease them. Moreover, the same way *Dura* precludes the inclusion of losses that do not relate to the harm alleged in the action, losses or gains that relate to a covering transaction that closed out a position that was established before fraud is alleged, are also precluded.

### B. Pension Funds Group Has Not Rebutted SIG's Adequacy or Typicality, Despite Suffering from Serious Infirmities That Render It Inadequate and Atypical Itself

---

[6] *See*, Movant Mages' Account Statement, 7/1/07 – 9/30/07 (redacted), delineating "Closed Positions." Exh. C to the K. Miller Decl. in Support of the SIG Reply Memo, filed herewith.

5

In addition to possessing the largest financial interest in the relief sought by the Class, SIG is a small, cohesive group that has demonstrated its ability to work together to manage this litigation. Moreover, SIG satisfies the adequacy and typicality prongs of Rule 23, and therefore should be appointed lead plaintiff in this action. Unlike the Pension Funds group, which is an amalgamation of what appears to be semi-professional, recidivist lead plaintiff movants, the members of SIG have each filed a sworn declaration that outlines their understanding of their duties and responsibilities, including but not limited to: (i) their willingness and commitment to work together, cooperatively; (ii) their understanding of their duties, both as individuals and as members of the group, in leading this action; (iii) their intention to regularly communicate with one another; (iv) their past practice of so communicating and strategizing to effectively litigate this action; and (v) the designee of one person as group spokesperson. Moreover, because SIG is composed of three members, and not two like the Pension Funds group, the issue of a decision stale-mate is completely avoided.

While the Pension Funds group attempts to cloak itself in the respectability of an institutional investor, and while it attempts to draw parallels between itself and funds such as CALPERS and NYS Common Retirement Fund that were appointed as lead plaintiffs in *Cendant,* the lack of cohesiveness of this group and the number of actions in which each of its members have served or sought to serve as lead plaintiff, clearly indicates that it is the Pension Funds group, and not SIG, that is the product of lawyer driven machinations. There is nothing in the record that evidences that the amalgamation of purported funds can or will cooperatively litigate this action. Also lacking from the record is any explanation as to why two small funds, such as WWLE and OESI, would seek to serve as lead plaintiff after moving for appointment, in the aggregate, of ***not less than 7 cases in under three years with its chosen counsel***.

In addition to being inadequate and/or atypical for the reasons stated herein, WWLE's sale of *all* of its shares immediately prior to the revelation of the alleged misrepresentations by SunOpta will, foreseeably, be exploited by defendants seeking to prove WWLE is incapable of acting as a Class representative. As the Court in this District has held previously, the "mere specter of antagonistic interest" is enough to find a lead plaintiff movant atypical and inadequate, even if viable defenses exist to a unique claim at issue. *Landry v. PWC,* 123 F.R.D. 474 (S.D.N.Y. 1989). Whether defenses may exist to insider trading, is of no matter. *Id.* at 476. *See also*, *In re Bally Total Fitness Sec. Lit.*, 2005 U.S. Dist. LEXIS 6243 at *19 (N.D. Ill. March 15, 2005) ("Our concern is that the time and attention Genesse would be required to devote to the loss causation issue (not to rebut a defense, but to prove its case) would distract it from the claims of the rest of the class.").[7]

In fact, both members of the Pension Fund group, WWLE and OECI, are rendered inadequate to serve as a lead plaintiff in this action by virtue of WWLE's irregular trading activity. The suspicious timing of these sales raises, at minimum, serious questions about WWLE's trading, and raises the possibility that WWLE had traded upon the receipt of adverse information that was not made available to the public. The decision of EOCI to move for lead with WWLE, *after* it presumably knew of its partner's infirmity, renders it too inadequate and atypical of the Class it now seeks to represent.

Because WWLE's trading strategy is of fundamental importance, the success of this action at the class certification stage may be directly impacted by the knowledge of its fellow movant OECI. Because the nature of communications amongst group members will be at issue,

---

[7] WWLE's fortuitous liquidation also raises the issue whether it relied on the efficiency of the market, and whether it can represent investors who have alleged a fraud-on-the-market theory.

7

and because these communications taint OECI's ability to assure that the Class' interests are protected, this Court must also disqualify OECI from serving as a Lead Plaintiff.

In addition to the foregoing, because WWLE and OECI move together they must now either succeed or fail together in their motion for appointment. This was recently acknowledged by the Coughlin firm when filing supplemental authority in the *Verifone* securities litigation, submitting recent opinions from *In re Atlas Mining Co. Sec. Litig*, 2008 U.S. Dist. LEXIS, *13-*16 (D. Idaho Mar. 25, 2008) and *Syntax-Brillian Sec. Litig,* CV-07-0224 (D. Ariz.), Slip op. dated April 4, 2008, for the proposition that "groups must rise or fall" together. *See* Exh. D (Coughlin Stoia notice of supplemental authority and copies of the two cases referenced therein) to the K.Miller Decl. in Support of the SIG Reply Memorandum, filed herewith.

While the Pension Funds group expends significant energy arguing about the Class Period, Rec. Doc. no. 23 (Mem. in Oppn. at 3 n.4, 5-7), these issues are also not material. Despite differing opinions about when the correct class period may begin, a cursory review of the Pension Funds group's trade-data reveals that an "apples-to-apples" comparison of losses is easily made. Not one single share of SunOpta stock was purchased by any member of the Pension Funds group prior to 8/14/07. Not only were all of the approximately 41,000 shares purchased by WWLE between 8/14/07 and 8/30/07 sold prior to the end of the Class Period - - and not subject to any *Dura* loss - - but the 31,500 shares purchased by OECI were acquired on 1/8/08 – 1/9/08 - - well after the inception of any Class Period in any complaint filed.

Accordingly, it is not true that the Class Period selected or the trade-data supplied by SIG would prevent this Court from making an "apples-to-apples" comparison regarding each movant's losses. The argument that any rights were compromised or limited at this stage, by adopting any of the shorter or longer Class Periods is spurious. It is not surprising that the

8

Pension Funds group can cite no case to support its position that the failure of movants' counsel to adopt a longer Class Period has any material effect on the adequacy or typicality of a moving party to serve as lead plaintiff in a securities class action brought under the PSLRA.

C.  **The Press Releases Issued by all Counsel Further the Goals of the PSLRA**

Contrary to the Pension Funds group's protestations, the issuance of press releases by counsel for SIG does not impact on either the adequacy or typicality of any member of this group. Again, citing no case to support its position, the Pension Funds group attempts to cast negative aspersions upon the publication of releases, simply by characterizing them as "solicitous," and fabricating that they evidence a "failure to supervise" counsel. In fact, such arguments demonstrate the Pension Funds' attempt to deny shareholders the opportunity to choose from a variety of experienced securities class action counsel to represent the Class.

While the Pension Funds group first claims that the publication of press releases is a "solicitation tactic" the PSLRA was designed to stop, in fact, it is the PSLRA itself that mandates the publication of notice by counsel that initiates an action: here that would be the first-filed action by Kahn Gauthier Swick, LLC ("KGS"). *See* 15 U.S.C. § 78u-4(a). The purpose of such notice is to notify purported class members of the pendency of the action and its claims, 15 U.S.C. §78u-4(a)(3)(A)(i), as well as to notify "any member of the purported class," that he or she "may move the court to serve as lead plaintiff of the purported class." 15 U.S.C. §78u-4(a)(3)(A)(i)-(ii). While the PSLRA clarifies that only plaintiffs in the first filed action are *required* to publish such notice, the statute places no restrictions on the filing of subsequent notices thereafter.[8]

---

[8] Remarkably, after *not* filing the initial complaint in this case the Coughlin firm published a gratuitous release, heralding its filing, and notifying investors of the pendency of the action filed by KGS.

9

In furtherance of Congress' goals in enacting the PSLRA, it is important that investors with substantial holdings are made aware of their choices in legal representation and of the fact that unless a Class is certified, they are not personally represented by counsel, and also will not be able to steer the litigation in which they have a large financial stake unless they step forward as a lead plaintiff movant. KGS' release did exactly that. To limit such notices from being filed would quash wide dissemination of notice of pending securities litigations to a variety of sources, and deprive potential class members from selecting counsel from a diverse pool of qualified firms – clearly a contrary result to the PSLRA notice's intended effect of informing class members about the action and their rights to serve as lead plaintiff.

Notwithstanding the propriety of KGS' press releases, arguments such as those advanced by the Pension Funds group have routinely been dismissed as a basis to rebut the adequacy of a lead plaintiff or its choice of counsel. *See, e.g., In re Optionable Securities Litigation*, 07-Civ.-3753 (LAK) (S.D.N.Y.), November 20, 2007 Order (Presumptive lead plaintiff KLD Investment Management, Inc. appointed lead plaintiff and its choice of lead counsel KGS ratified by Judge Lewis Kaplan despite similar arguments from competing movant concerning the propriety of press releases), Exh. E to the K. Miller Decl. in Support of the SIG Reply Memo, filed herewith.

## CONCLUSION

For the foregoing reasons, the SunOpta Investors Group respectfully request that the Court grant its motion in full and appoint it as lead plaintiff and approve its selection of KGS as lead counsel.

Dated: April 24, 2008                  Respectfully submitted,

**KAHN GAUTHIER SWICK, LLC**

  /s/ Kim E. Miller
Kim E. Miller (KM-6996)
12 East 41st Street, 12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

**KAHN GAUTHIER SWICK, LLC**
Lewis S. Kahn
650 Poydras St., Suite 2150
New Orleans, Louisiana 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Counsel for The SunOpta Investors Group and Proposed Lead Counsel for the Class*

11

**CERTIFICATE OF SERVICE**

    I hereby certify that this Memorandum was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on April 24, 2008.

                                                    /s/   Kim E. Miller
                                                       Kim E. Miller