# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TROY ARDEN JULIAR, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SUNOPTA, INC., STEVEN BROMLEY, JOHN H. DIETRICH, and STEPHEN R. BRONFMAN,<br><br>Defendants. | **CASE NUMBER: 08-CV-00933**<br><br>**JUDGE PAUL A. CROTTY** |
| STEPHEN STRUGALA, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SUNOPTA, INC., STEVEN BROMLEY, JOHN H. DIETRICH, and STEPHEN R. BRONFMAN,<br><br>Defendants. | **CASE NUMBER: 08-CV-01070**<br><br>**JUDGE PAUL A. CROTTY** |
| RAY FOSTER, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SUNOPTA, INC., STEVEN BROMLEY, JOHN H. DIETRICH,<br><br>Defendants. | **CASE NUMBER: 08-CV-01313**<br><br>**JUDGE PAUL A. CROTTY** |

|  |  |
|---|---|
| ROGER DAVIDSON, Individually And On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | **CASE NUMBER: 08-CV-01496** |
| vs. ) | **JUDGE PAUL A. CROTTY** |
| SUNOPTA, INC., STEVEN BROMLEY, JOHN H. DIETRICH, ) ) ) | |
| Defendants. ) | |

ROGER DAVIDSON, Individually And
On Behalf of All Others Similarly Situated,

    Plaintiff,

  vs.

SUNOPTA, INC., STEVEN BROMLEY,
JOHN H. DIETRICH,

    Defendants.

**CASE NUMBER: 08-CV-01496**

**JUDGE PAUL A. CROTTY**

MARIE LORENZATO, Individually And
On Behalf of All Others Similarly Situated,

    Plaintiff,

  vs.

SUNOPTA, INC., STEVEN BROMLEY,
JOHN H. DIETRICH,

    Defendants.

**CASE NUMBER: 08-CV-01844**

**JUDGE PAUL A. CROTTY**

ROBERT KNOX, Individually And
On Behalf of All Others Similarly Situated,

    Plaintiff,

  vs.

SUNOPTA, INC., STEVEN BROMLEY,
JOHN H. DIETRICH, and STEPHEN R.
BRONFMAN,

    Defendants.

**CASE NUMBER: 08-CV-02034**

**JUDGE PAUL A. CROTTY**

ALBERT HALEGOUA, Individually And
On Behalf of All Others Similarly Situated,

                           Plaintiff,

           vs.

SUNOPTA, INC., STEVEN BROMLEY,
JOHN H. DIETRICH, and STEPHEN R.
BRONFMAN,

                      Defendants.

**CASE NUMBER: 08-CV-02910-UA**

---

### DECLARATION OF KIM E. MILLER IN SUPPORT OF THE REPLY MEMORANDUM IN SUPPORT OF THE SUNOPTA INVESTORS GROUP MOTION TO CONSOLIDATE RELATED ACTIONS; TO BE APPOINTED LEAD PLAINTIFF; AND TO APPROVE PROPOSED LEAD PLAINTIFF'S CHOICE OF COUNSEL AND IN FURTHER OPPOSITION TO COMPETING MOTIONS

I, Kim E. Miller, hereby declare as follows:

1.      I am member of the law firm of Kahn Gauthier Swick, LLC.

2.      Movants seek appointment as Lead Plaintiffs pursuant to Section 21D of the Securities Exchange Act of 1934 in the above-captioned actions.

3.      I submit this Declaration, together with the attached exhibits, in support of the Reply Memorandum of the SunOpta Investors Group, to appoint it to serve as Lead Plaintiff on behalf of the Class and to approve Movant's choice of Kahn Gauthier Swick, LLC, as Lead Counsel. I am fully familiar with the facts set forth herein.

4.      Attached hereto as Exhibit A is a true and correct copy of the Declaration of Kenneth N. Kotz, submitted in *In re Comverse Technology Sec. Litig.*, No. 06-1825 (E.D.N.Y.).

5.      Attached hereto as Exhibit B are true and correct copies of P&P movant's LIFO presentation supporting documentation (submitted originally in *In re Comverse Sec. Litig.,* No. 06-1825, Rec. Doc. no. 56-1 (E.D.N.Y.).

6.     Attached hereto as Exhibit C is a true and correct copy of Movant Mages' Account Statement for the Period 7/1/07 – 9/30/07 (redacted), delineating "Closed Positions."

7.     Attached hereto as Exhibit D are true and correct copies of the Notice of Supplemental Authority, and attached exhibits, filed by the Coughlin Stoia firm in *In re Verifone Holdings, Inc. Sec. Litig.*, 07-cv-06140-MHP (N.D. Cal.).

8.     Attached hereto as Exhibit E is a true and correct copy of *In re Optionable Securities Litigation*, 07-Civ.-3753, Order appointing lead plaintiff (S.D.N.Y. Nov. 20, 2007).


I declare under penalty of perjury under the laws of the state of New York that the foregoing facts are true and correct.  Executed this 24th day of April, 2008, at New York, New York.



                    /s/ Kim E. Miller
                    Kim E. Miller

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ANTHONY CAIAFA, individually and on
behalf of all others similarly situated,

                              Plaintiffs,            Civil Action No. 06 CV 1825 (NGG)

      -against-

COMVERSE TECHNOLOGY, INC., KOBI
ALEXANDER, ZEEV BREGMAN, DAVID
KREINBERG, and ITSIK DANZIGER

                   Defendants.
-------------------------------------------------------------x
-------------------------------------------------------------x
JAMES M. GORMAN, individually and on
Behalf of All Others Similarly Situated,

                              Plaintiffs,            Civil Action No. 06 CV 2738 (NGG)

      -against-

COMVERSE TECHNOLOGY, INC., KOBI
ALEXANDER, ZEEV BREGMAN, DAVID
KREINBERG, and ITSIK DANZIGER,

                   Defendants.
-------------------------------------------------------------x

## DECLARATION OF KENNETH N. KOTZ

    I, Kenneth N. Kotz, declare as follows:

    1.      I have been retained by Pomerantz Haudek Block Grossman & Gross LLP

("Counsel") on behalf of Plaintiffs Menorah Insurance Co., Ltd. ("Menorah") and Mivtachim

Pension Funds Ltd. ("Mivtachim", collectively, the "Menorah Group"), to assist in calculating

the market profits and losses of certain plaintiff groups for their transactions in Comverse

Technology, Inc. ("Comverse") common stock during the period April 30, 2001 through April

16, 2006 (the "Class Period"),[1] as well as transactions made after the Class Period through June 16, 2006. In addition to the transactions of the Menorah Group, I have been asked to analyze the transactions of the "Gould-Leumi Group"[2] and of the Plumbers and Pipefitters National Pension Fund ("Plumbers and Pipefitters").

      2.     I have been asked to calculate the net gains or losses for the transactions for these plaintiff groups over several time periods: prior to the Class Period ("Pre CP"); April 30, 2001 through March 13, 2006 ("Sub Period 1"); March 14, 2006 through April 16, 2006 ("Sub Period 2"); April 17, 2006 through June 16, 2006 ("Post CP Period") and shares still held as of June 16, 2006 ("Held shares"). Specifically , I have been asked to calculate the number of net shares purchased and the net gains or losses for: (i) shares purchased in Sub Period 1 and held past March 13, 2006; and (ii) shares purchased in Sub Period 2 and held past April 16, 2006.

      3.     I first perform the analysis on a "Net" method, which yields total net purchases or sales and total gains or losses over a specified time period. I next match purchase and sale transactions over the time periods specified by Counsel to calculate total gains or losses for purchases and sales within and among the different periods. This requires the use of an inventory methodology to match purchases (or opening balances) with subsequent sales. I

---

[1] I note that April 16, 2006 is a Sunday. The last trading day prior to April 16, 2006 was Thursday, April 13, 2006. See Exhibit 15 for daily stock price data for Comverse from April 1, 2001 through June 16, 2006.

[2] The Gould-Leumi Group consists of the accounts associated with members of the Gould Family ("Gould accounts") and with funds run by the Leumi-Pia Trust Fund Management Co., Ltd. (the "Leumi-Pia funds"). The Gould accounts are as follows: Doris Gould Family Trust; Jacques J. Gould Family Trust; and Roger Gould. The Leumi-Pia funds are as follows: Flexible Foreign; Hi-Tech; S&P 100; Export; and Pia 10/90.

perform the analysis using both a "First-In-First-Out" ("FIFO") and "Last-In-First-Out" ("LIFO") methodology, as described later in this Declaration.

4.      I find that the Menorah Group had the greatest number of shares either (i) purchased in Sub Period 1 and held past 3/13/06 or (ii) purchased in Sub Period 2 and held past 4/16/06, and that the Menorah Group had the largest net market losses on these share transactions.

## QUALIFICATIONS, COMPENSATION, AND MATERIALS REVIEWED

5.      I am a Vice President of Forensic Economics, Inc., located in Rochester, New York. I have been employed by Forensic Economics since 1999. I have consulted on issues pertaining to financial valuations, financial-economic analysis, and the analysis of stock prices' reaction to public information in securities fraud lawsuits during this time period. Forensic Economics has been retained by both plaintiffs and defendants in such securities cases.

6.      I hold an M.S. in Applied Economics (1999) from the University of Rochester's William E. Simon Graduate School of Business Administration. I hold an M.B.A. in Finance (1996) from the Loyola University Chicago Graduate School of Business, where I also received an Outstanding Student award. I have co-taught a corporate finance class and served as a research and teaching assistant at the University of Rochester. I have served as a research assistant to the finance faculty of the Loyola University Chicago Graduate School of Business. My resume is attached to this Declaration as Exhibit 1.

7.      My compensation is based on the number of hours worked plus out-of-pocket expenses. My hourly rate is $230. I was assisted by employees of Forensic Economics, Inc.,

3

who worked under my supervision and direction in connection with this assignment. Forensic

Economics, Inc.'s hourly rates for employees range from $75 to $350.

       8.     In the course of this assignment, I reviewed Comverse stock price data and

dividend history obtained from Bloomberg[3] and the following documents supplied electronically

by Counsel:

> A document, attached as Exhibit 16, containing the Certifications of the Menorah Group along with an additional table listing gains and losses.

> A document, attached as Exhibit 17, labeled Exhibit A that contained: i) the Lead Plaintiff Certifications for the Gould accounts, along with a table listing gains and losses; and (ii) the Certification for the Leumi-Pia funds, along with a table labeled Exhibit A with a "Loss Analysis of Transactions in Comverse Technology" and another table listing gains and losses.

> A document, attached as Exhibit 18, containing the Certification for Plumbers and Pipefitters including "Schedule A" listing the securities transactions for Plumbers and Pipefitters.

> A document, attached as Exhibit 19, with a table labeled "Movant's Purchases and Losses" for Plumbers and Pipefitters.

       9.     I have attempted to cite in the text of this Declaration specific documents and

information on which I relied in my analysis.

---

[3] I obtained stock price data for the period April 2, 2001 through June 23, 2006, including the daily low, high, and closing prices for Comverse common stock and the daily closing level of the S&P 500 Index.

## ANALYSIS

### Description of Data Used

10.     I first detail the source of the transaction data I used and assumptions that I made in order to perform the analysis.[4] These calculations are subject to change if any data is altered or amended. For the Menorah Group, I utilized the data listed in their Certifications (attached as Exhibit 16). Exhibit 2 lists the transactions in chronological order and contains a running share balance. I also compare the per-share prices for the Menorah Group to the low and high prices for Comverse on the trade date. For Menorah, the traded price per share is always within the low and high prices for the data reported on Bloomberg. For Mivtachim's two transactions, both purchases, one occurred at a price per share $0.34 greater than the reported high (1.4%), and the other occurred at a price per share $0.47 lower than the reported low (2.0%). Without trading records, I cannot confirm the accuracy of the per-share prices, but these discrepancies appear to be minimal and I utilize the prices as given in my analysis.

11.     For the Gould accounts, I utilized the data listed in their Certifications (attached as Exhibit 17). Exhibit 3 details the transactions. Exhibit 3 contains two panels. In Panel A, the actual sales proceeds from the Certifications are used. In Panel B, at the request of counsel, I have substituted the actual sale price with the average trading price from April 17, 2006 through the date of sale (rounded to two decimals). I label this calculation as the "PSLRA sale price."[5]

---

[4] I note that Comverse engaged in stock splits in April 1999 and April 2000. Because these stock splits occurred before April 2001, there should be no need to adjust the transaction data for stock splits.

[5] The Private Securities Litigation Reform Act of 1995 ("PSLRA") places an upper limit on the maximum amount of recoverable damages, which is the difference between the purchase price paid and the mean trading price of the security for the 90-day period beginning on the day

The Gould account Certifications do not list a per-share price, but rather total proceeds. For Panel A, to calculate a per-share price, I divide the total transaction amount by the number of shares. This yields prices that extend beyond four decimal places. It is likely these transaction amounts include commissions or fees, but it cannot be confirmed without the trade confirmations. All of the calculated per-share prices for the Gould accounts are within the reported low and high prices. For Panel B, the sales proceeds are calculated by multiplying the shares by the PSLRA sale price.

12.    For the Leumi-Pia funds, I begin by utilizing the data listed in the document labeled Exhibit A entitled "Loss Analysis of Transactions in Comverse Technology" (attached as Exhibit 17). These transactions are listed in Exhibit 4. For these transactions, the following funds had transactions with per-share prices outside of the reported low and high traded price range: Flexible Foreign (4); Hi-Tech (2); and Export (4). All of these transactions occurred below the low reported trading price, and all but one were sale transactions. The prices ranged from 0.5% to 31.7% below the reported low price. Some of these price discrepancies appear to be quite high, but absent trade confirmations, the prices cannot be confirmed. For the purposes of this analysis, I utilize the prices given in the data.[6]

---

on which the information correcting the misstatements or omissions that are the basis for the action is disseminated to the market (or the mean trading price through the date of sale if a share is sold within the 90-day period).

   [6] For example, the Export fund lists a purchase on 1/3/02 at $15.80 per share. However, according to Bloomberg, Comverse common stock traded between $23.15 to $25.00 per share on that day, closing at $25.00. Comverse closed at $23.15 the previous trading day and $25.75 the following trading day.

13.    There is a second problem with the data for the Leumi-Pia funds. As can be seen in Exhibit 4, the share balances for the Flexible Foreign, Hi-Tech and S&P 100 funds all go below zero at some point (denoted by bold font and border). Either these funds are engaging in short sale transactions or there is a data error. This error could either be with an incorrect sale or purchase, an incorrect opening balance or a missing transaction. I therefore adjust the data to maintain a share balance that does not go below zero. The adjusted data is presented in Exhibit 5. I make the following adjustments:

a) For the Flexible Foreign fund, the sale of 10,000 shares on 9/20/01 is reduced to a sale of 1,900 shares. This appears to be the same adjustment made in the table that followed the Leumi-Pia Exhibit A (attached as Exhibit 17), which lists a sale (offset) of 1,900 shares on 9/20/01 (and an additional sale of 1,100 shares on 9/20/01), but no sale of 10,000 shares. All other transactions match.

b) For the Hi-Tech fund, I create an opening balance of 100 shares and make no adjustments to the actual purchases and sales. No adjustments were made in the table that followed the Leumi-Pia Exhibit A (attached as Exhibit 17), which separated the buys and sales and then totaled them without regard to timing. The negative share balance is apparent if you put the trades in chronological order. This adjustment results in the Hi-Tech fund retaining 4,500 shares rather than 4,400 shares, which equal the total shares purchased starting in March 2006.

c) For the S&P 100 fund, the sale on 1/15/02 of 3,800 shares is reduced to 2,300 shares. This appears to be the same adjustment made in the table that followed the Leumi-Pia Exhibit A (attached as Exhibit 17), which lists a sale (offset) of 2,300 shares on 1/15/02 (and an additional sale of 1,500 shares on 1/15/02). All other transactions match.

14.    Exhibit 5 shows the adjusted Leumi-Pia funds data with share balances that do not go below zero.

15.    For the Plumbers and Pipefitters, I utilized the data listed in the document labeled Schedule A (attached as Exhibit 18). This document's price and share amounts comport with the

7

other available table regarding Plumbers and Pipefitters (attached as Exhibit 19).[7] Exhibit 6

details the transactions. The majority of the Plumbers and Pipefitters transactions are based on

settlement dates rather than trade dates. Comparing the low and high traded prices on the

settlement day is erroneous, so I compare the settlement day price to the low and high trading

price 3 trading days prior to the settlement day.[8] Out of 130 transactions, 10 are not within this

range.

16.     I have utilized the data as provided as described above, including making the

three adjustments to the Leumi-Pia funds' transactions. The results of this analysis are subject to

change if the data or any of the assumptions I used in the analysis are revised.

**Net Share Analysis**

17.     I first perform an analysis of the net shares purchased and sold over the varying

time periods. Exhibit 7 is a summary of the results, which shows the total shares purchased, total

shares sold, net shares purchased and/or sold over the various periods, and holdings as of the end

of each period. This analysis does not attempt to match up transactions, but merely gives a total

number of shares purchased and/or sold over a specified time frame. I have been specifically

asked to analyze the number of shares purchased in Sub Period 1 that were held past 3/13/06 and

the number of shares purchased in Sub Period 2 that were held past 4/16/06.

---

[7] The total cost and proceeds in the additional table do not always match the number of
shares multiplied by the price per share. For example, the 1,000 shares sold on 7/16/01 at a price
of $32.50 are listed as having total proceeds of $32,498.91, rather than my calculation of
$32,500.00.

[8] Trades are required to be settled within three business days: "Investors must settle their
security transactions in three business days. This settlement cycle is known as 'T+3' —
shorthand for 'trade date plus three days.' " U.S. Securities and Exchange Commission, "About
Settling Trades in Three Days: T + 3," http://www.sec.gov/investor/pubs/tplus3.htm.

18.     The Menorah Group's purchases all occur during Sub Period 2, with no subsequent sales. The Menorah Group therefore made net purchases of 172,500 during Sub Period 2 that were held past 4/16/06.

19.     The Gould accounts made all their purchases in Sub Period 2, and these were subsequently sold in the Post CP Period. The Gould accounts therefore made net purchases of 82,440 shares during Sub Period 2 that were held past 4/16/06.

20.     The Leumi-Pia funds had an opening balance of 4,400 shares. In Sub Period 1, the funds had net sales of 4,400 shares. Therefore, as of 3/13/06, the Leumi-Pia funds had zero share balances.[9] The Hi-Tech fund made net purchases of 4,500 shares in Sub Period 2, which were then held past 4/16/06. The Leumi-Pia funds therefore made net purchases of 4,500 shares during Sub Period 2 that were held past 4/16/06. All other purchases, which were made in Sub Period 1, were sold prior to 3/14/06.

21.     In total, the Gould-Leumi group had net purchases of 86,940 shares (82,440+4,500) during Sub Period 2 that were retained past 4/16/06.

22.     Plumbers and Pipefitters made the majority of their purchases and sales in Sub Period 1 with a net amount of 172,126 purchased shares, which were held past 3/13/06. It purchased an additional 30 shares in Sub Period 2, which were held past 4/16/06. Plumbers and Pipefitters therefore purchased 172,156 shares that were either held past 3/13/06 (if purchased in Sub Period 1) or held past 4/16/06 (if purchased in Sub Period 2). Plumbers and Pipefitters purchased and sold an additional 362,315 shares during Sub Period 1.

_____

[9] As can be seen in Exhibit 5, each of the fund's share balances were zero prior to March 14, 2006.

23.    The following table is a summary of the number of shares purchased by each plaintiff group that were either held past 3/13/06 (if purchased in Sub Period 1) or held past 4/16/06 (if purchased in Sub Period 2):

| Plaintiff Group | Total of Sub Period 1 Purchases Held Past 3/13/06 and Sub Period 2 Purchases Held Past 4/16/06 |
|---|---|
| Menorah Group | 172,500 |
| Gould-Leumi Group | 86,940 |
| Plumbers and Pipefitters | 172,156 |

24.    The Menorah Group had the most number of shares purchased that were either held past 3/13/06 (if purchased in Sub Period 1) or held past 4/16/06 (if purchased in Sub Period 2).

**Net Proceeds Analysis**

25.    Similar to the net shares analysis above, I next calculate the net gains and/or losses within the periods. Each purchase has a total cost, while each sale realizes proceeds. The net gain and/or loss is the sum of the total purchase costs and the total sale proceeds. A net gain means that proceeds from sales are greater than the purchase costs, while a net loss means that the proceeds from sales are less than the purchase costs. In this analysis, however, the shares purchased and sold are not matched, so a Sub Period can have a relatively greater gain or loss simply because there are more (or less) share purchases than sales. In addition, a Pre CP holding (opening balance) will generate future sale proceeds, but will have no purchase cost.

10

26.     It is also necessary to calculate proceeds for shares still held after 6/16/06.[10]  I have been asked to assume by Counsel that the relevant sale price for this purpose is the mean closing price over the period 4/17/06 through 6/16/06, which I calculate to be $22.38 per share (rounded to two decimal places).  Counsel has also asked me utilize an alternative sale price for the Gould accounts for the sales they made during the Post CP period.  In this alternative calculation, I was asked to assume that the average closing price from 4/17/06 through the date of sale be used, which I labeled the "PSLRA sale price."  The Gould accounts all sold their shares on 5/12/06, at which time the mean closing price from 4/17/06 through 5/12/06 was $22.98 (compared with their implied actual sale prices of approximately $22 per share).

27.     Exhibit 8 details the net losses or gains over the various time periods.  However, these net losses represent shares purchased and sold over the different Sub Periods.  Counsel has requested that I calculate the net gains and/or losses for shares purchased in Sub Period 1 and held past 3/13/06 and for shares purchased in Sub Period 2 and held past 4/16/06.  In order to calculate net gains or losses of shares purchased and subsequently sold in a specified time period, it is necessary to match purchases (and Pre CP holdings) to subsequent sales.  This calculation is performed in the following two sections using alternative inventory methodologies to match purchases and sales.

---

[10] This is effectively calculating an "unrealized" gain/loss assuming the shares are hypothetically sold at a specific price.

**FIFO Gains/Losses Analysis**

28.    The first inventory method employed is the "First-In-First-Out" or "FIFO" methodology.  Under the FIFO methodology, a sale is matched to the earliest purchase of shares (occurring prior to the sale).  For example, if an investor purchased 100 shares at time 1 and again at time 2 (for a total of 200 shares), and subsequently sold 100 shares at time 3, the shares sold at time 3 would be matched to the earliest purchase of shares at time 1.  The remaining time 2 purchased shares would be matched to the next sale, because it will now become the earliest purchase, even if more purchases are subsequently made.  Purchases unmatched to sales are considered held.  Sales are only matched to purchases occurring prior to the sale, i.e., a purchase can only be matched to a subsequent sale.

29.    A summary of the FIFO net gains/losses is presented in Exhibit 9A.[11]  The Exhibit details the net gain or loss for matched transactions based on the period the shares were purchased and the period where the sales were deemed to be sold.  None of the accounts made purchases after 4/16/06, so the purchase ranges are: Pre CP (opening share balances); 4/30/01 - 3/13/06 (Sub Period 1); and 3/14/06 - 4/16/06 (Sub Period 2).  Sale ranges are: 4/30/01 - 3/13/06 (Sub Period 1); 3/14/06 - 4/16/06 (Sub Period 2); 4/17/06 - 6/16/06 (Post CP Period); and Held shares (unsold shares as of 6/16/06, which are treated as selling at a price of $22.38 per share).

30.    For the Menorah Group, none of the shares purchased were sold, so the choice of inventory methodology is irrelevant.  All purchases are held past 6/16/06.  The net losses for the Menorah Group for shares purchased during Sub Period 2 and held through the end of the Class Period are $343,202.50.

_____

[11] A summary of the number of shares purchased and sold is included as Exhibit 9B.

31.   For the Gould accounts, each account made one purchase and one off-setting sale transaction. Again, the inventory methodology is irrelevant for these accounts because there is one exact matching transaction. For the Gould accounts, all purchases occurred in Sub Period 2 and were sold in the Post CP period. As described previously, the net losses are calculated using two different sale prices, one being the actual sale price and the other the PSLRA sale price. For shares purchased during Sub Period 2 and sold during the Post CP Period, and using the actual sale price, the Gould accounts had net losses of $216,141.28. For shares purchased during the Sub Period 2 and sold during the Post CP Period, and using the PSLRA sale price, the Gould accounts had net losses of $136,759.55.

32.   The Leumi-Pia funds made multiple purchases and sales within the Class Period, and also had opening share balances. Exhibit 10 details the FIFO matching on a transaction by transaction basis for the funds. As a single sale transaction will not necessarily equal a single purchase transaction, the individual purchase and sale transactions are divided according to the FIFO methodology. Therefore, a single row in Exhibit 10 will not necessarily match the transaction data listed in Exhibit 5. Under the FIFO analysis, Pre CP holdings are the first purchases matched to sales. For all the Leumi-Pia funds, all Pre CP holdings and Sub Period 1 purchases were sold prior to Sub Period 2. The Hi-Tech fund made additional purchases of 4,500 shares in Sub Period 2, which were subsequently held past 6/16/06. Using $22.38 as a sale price, these purchases had a net loss of $11,475.00. Therefore, the total net losses for the Leumi-Pia funds for shares purchased in Sub Period 1 and held past 3/13/06 or purchased in Sub Period 2 and held past 4/16/06 were $11,475.00.

13

33.    The Plumbers and Pipefitters did not have an opening balance of shares, but made numerous purchases and sales during Sub Period 1 and an additional purchase in Sub Period 2. Exhibit 11 details the FIFO matching on a transaction by transaction basis for the Plumbers and Pipefitters. As a single sale transaction will not necessarily equal a single purchase transaction, the individual sale and purchase transactions are divided according to the FIFO methodology. Therefore, a single row in Exhibit 11 will not necessarily match the transaction data listed in Exhibit 6. Under FIFO, 362,215 shares were purchased and sold within Sub Period 1. The remaining 172,126 shares purchased in Sub Period 1 and held past 3/13/06 had net gains of $132,781.10 (using $22.38 as a sale price). The 30 shares purchased in Sub Period 2 that were held past 4/16/06 had a net loss of $58.80. Therefore, the total net gains for the Plumbers and Pipefitters for shares purchased in Sub Period 1 and held past 3/13/06 or purchased in Sub Period 2 and held past 4/16/06 were $132,722.30.[12]

34.    The following table lists the total net losses or gains using FIFO for each of the groups for shares that were either: (i) purchased in Sub Period 1 and held past 3/13/06, or (ii) purchased in Sub Period 2 and held past 4/16/06.

---

[12] $132,722.30 = $132,781.10 + ($58.80)

| Plaintiff Group | Net (Losses) / Gains Using FIFO For Sub Period 1 Purchases Held Past 3/13/06 or Sub Period 2 Purchases Held Past 4/16/06 |
|---|---|
| Menorah Group | ($343,302.50) |
| Gould-Leumi Group (using actual sale price) | ($227,616.28) = ($216,141.28) + ($11,475.00) |
| Gould-Leumi Group (using PSLRA sale price) | ($148,234.55)= ($136,759.55) + ($11,475.00) |
| Plumbers and Pipefitters | $132,722.30= $132,781.10 + ($58.80) |

35.    Using the FIFO methodology, the Menorah Group had the greatest losses for shares purchased during the Class Period that were either held past 3/13/06 (if purchased in Sub Period 1) or held past 4/16/06 (if purchased in Sub Period 2).

**LIFO Gains/Losses Analysis**

36.    The second inventory method employed is the "Last-In-First-Out" or "LIFO" methodology.  Under the LIFO methodology, a sale is matched to the most recent purchase of shares (occurring prior to the sale).  For example, if an investor purchased 100 shares at time 1 and again at time 2 (for a total of 200 shares), and subsequently sold 100 shares at time 3, the shares sold at time 3 would be matched to the most recent purchase of shares at time 2.  The remaining time 1 purchased shares would be matched to the next sale if no intervening purchase occurs, but if another purchase occurs, any subsequent sales will first be matched to this purchase, because this new purchase will now become the most recent purchase.[13]  Purchases

---

[13] As more purchases are made, they will, in turn, become the most recent purchase to be matched against the next sale.

unmatched to sales are considered held. Sales are only matched to purchases occurring prior to the sale, i.e., a purchase can only be matched to a subsequent sale.

37. A summary of the LIFO net gains/losses is presented in Exhibit 12A.[14] The Exhibit details the net gain or loss or matched transactions based on the period the shares were purchased and the period where the sales were deemed to be sold. None of the accounts made purchases after 4/16/06, so the purchase ranges are: Pre CP (opening share balances); 4/30/01 - 3/13/06 (Sub Period 1); and 3/14/06 - 4/16/06 (Sub Period 2). Sale ranges are: 4/30/01 - 3/13/06 (Sub Period 1); 3/14/06 - 4/16/06 (Sub Period 2); 4/17/06 - 6/16/06 (Post CP Period); and Held shares (unsold shares as of 6/16/06, which are treated as selling at a price of $22.38 per share).

38. For the Menorah Group, none of the shares purchased were sold, so the choice of inventory methodology is irrelevant. All purchases are held past 6/16/06. The net losses for the Menorah Group for shares purchased during Sub Period 2 and held through the end of the Class Period are $343,202.50.

39. For the Gould accounts, each account made one purchase and one off-setting sale transaction. Again, the inventory methodology is irrelevant for these accounts because there is one exact matching transaction. For the Gould accounts, all purchases occurred in Sub Period 2 and were sold in the Post CP period. As described previously, the net losses are calculated using two different sale price, one being the actual sale price and the other the PSLRA sale price. For shares purchased during Sub Period 2 and sold during the Post CP Period, and using the actual sale price, the Gould accounts had net losses of $216,141.28. For shares purchased during Sub

---

[14] A summary of the number of shares purchased and sold is included as Exhibit 12B.

Period 2 and sold during the Post CP Period, and using the PSLRA sale price, the Gould accounts had net losses of $136,759.55.

40.    The Leumi-Pia funds made multiple purchases and sales within the Class Period, and also had opening share balances. Exhibit 13 details the LIFO matching on a transaction by transaction basis for the funds. As a single sale transaction will not necessarily equal a single purchase transaction, the individual purchase and sale transactions are divided according to the LIFO methodology. Therefore, a single row in Exhibit 13 will not necessarily match the transaction data listed in Exhibit 5. Under the LIFO analysis, Pre CP holdings are the last purchases matched to sales. For all the Leumi-Pia funds, all Pre CP holdings and Sub Period 1 purchases were sold prior to Sub Period 2. The Hi-Tech fund made additional purchases in Sub Period 2, which were subsequently held past 6/16/06. Using $22.38 as a sale price, these purchases had a net loss of $11,475.00. Therefore, the total net losses for the Leumi-Pia funds for shares purchased in Sub Period 1 and held past 3/13/06 or purchased in Sub Period 2 and held past 4/16/06 were $11,475.00.

41.    The Plumbers and Pipefitters did not have an opening balance of shares, but made numerous purchases and sales during Sub Period 1 and an additional purchase in Sub Period 2. Exhibit 14 details the LIFO matching on a transaction by transaction basis for the Plumbers and Pipefitters. As a single sale transaction will not necessarily equal a single purchase transaction, the individual purchase and sale transactions are divided according to the LIFO methodology. Therefore, a single row in Exhibit 14 will not necessarily match the transaction data listed in Exhibit 6. Under LIFO, shares 362,215 shares were purchased and sold within Sub Period 1. The remaining 172,126 shares purchased in Sub Period 1 and held past 3/13/06 had net gains of

17

$316,905.20 (using $22.38 as a sale price). The 30 shares purchased in Sub Period 2 that were held past 4/16/06 had a net loss of $58.80. Therefore, the total net <u>gains</u> for the Plumbers and Pipefitters for shares purchased in Sub Period 1 and held past 3/13/06 or purchased in Sub Period 2 and held past 4/16/06 were $316,846.40.[15]

42.    The following table lists the total net losses or gains using LIFO for each of the groups for shares that were either: (i) purchased in Sub Period 1 and held past 3/13/06 or (ii) purchased in Sub Period 2 and held past 4/16/06.

| **Plaintiff Group** | **Net (Losses) / Gains Using LIFO For Sub Period 1 Purchases Held Past 3/13/06 or Sub Period 2 Purchases Held Past 4/16/06** |
|---|---|
| Menorah Group | ($343,302.50) |
| Gould-Leumi Group (using actual sale price) | ($227,616.28) = ($216,141.28) + ($11,475.00) |
| Gould-Leumi Group (using PSLRA sale price) | ($148,234.55)= ($136,759.55) + ($11,475.00) |
| Plumbers and Pipefitters | $316,846.40= $316,905.20 + ($58.80) |

43.    Using LIFO methodology, the Menorah Group had the greatest losses for shares purchased during the Class Period that were either held past 3/13/06 (if purchased in Sub Period 1) or held past 4/16/06 (if purchased in Sub Period 2).

44.    This analysis is subject to change pending revisions in either the data or assumptions underlying this analysis.

---

[15] $316,846.40 =$316,905.20 + ($58.80).

18

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 6th day of July, 2006
at Rochester, New York

Kenneth N. Kotz

| Name | Date | Shares Purchased | Share Price | Total Cost | Date | Shares Sold | Share Price | Total Proceeds | Total Gain (Loss)* |
|------|------|-----------------|-------------|------------|------|-------------|-------------|----------------|--------------------|
| Plumbers and Pipefitters National Pension Fund | 03/22/2006 - SD | 30 | $24.34 | $730.05 | 07/16/2001 - SD | 30 | $32.50 | $974.97 | |
| Plumbers and Pipefitters National Pension Fund | 07/25/2005 - SD | 970 | $24.83 | $24,083.16 | 07/16/2001 - SD | 970 | $32.50 | $31,523.94 | |
| Plumbers and Pipefitters National Pension Fund | 07/25/2005 - SD | 3,766 | $24.83 | $93,502.25 | 11/08/2001 - SD | 3,766 | $20.88 | $78,625.05 | |
| Plumbers and Pipefitters National Pension Fund | 06/29/2005 | 934 | $23.91 | $22,331.75 | 11/08/2001 - SD | 934 | $20.88 | $19,499.68 | |
| Plumbers and Pipefitters National Pension Fund | 06/29/2005 | 4,896 | $23.91 | $117,062.38 | 11/08/2001 - SD | 4,896 | $20.64 | $101,040.27 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 2,504 | $23.98 | $60,054.68 | 11/08/2001 - SD | 2,504 | $20.64 | $51,675.83 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 5,200 | $23.98 | $124,714.20 | 11/09/2001 - SD | 5,200 | $20.24 | $105,254.37 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 1,200 | $23.98 | $28,780.20 | 11/20/2001 - SD | 1,200 | $23.70 | $28,440.25 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 5,200 | $23.98 | $124,714.20 | 11/21/2001 - SD | 5,200 | $23.91 | $124,342.93 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 3,400 | $23.98 | $81,543.90 | 11/23/2001 - SD | 3,400 | $24.20 | $82,280.65 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 100 | $23.98 | $2,398.35 | 11/26/2001 - SD | 100 | $24.00 | $2,399.92 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 200 | $23.98 | $4,796.70 | 12/10/2001 - SD | 200 | $24.03 | $4,805.83 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 2,800 | $23.98 | $67,153.80 | 12/11/2001 - SD | 2,800 | $24.48 | $68,548.99 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 800 | $23.98 | $19,186.80 | 12/12/2001 - SD | 800 | $24.03 | $19,221.99 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 900 | $23.98 | $21,585.15 | 12/13/2001 - SD | 900 | $22.74 | $20,469.81 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 1,400 | $23.98 | $33,576.90 | 12/17/2001 - SD | 1,400 | $23.50 | $32,898.90 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 8,500 | $23.98 | $203,859.75 | 12/17/2001 - SD | 8,500 | $20.96 | $178,124.30 | |
| Plumbers and Pipefitters National Pension Fund | 06/28/2005 | 4,596 | $23.98 | $110,228.17 | 12/17/2001 - SD | 4,596 | $22.55 | $103,655.64 | |
| Plumbers and Pipefitters National Pension Fund | 02/18/2005 | 5,304 | $23.38 | $123,996.91 | 12/17/2001 - SD | 5,304 | $22.55 | $119,623.49 | |
| Plumbers and Pipefitters National Pension Fund | 02/18/2005 | 17,100 | $23.38 | $399,763.80 | 12/17/2001 - SD | 17,100 | $21.16 | $361,803.41 | |
| Plumbers and Pipefitters National Pension Fund | 02/18/2005 | 6,096 | $23.38 | $142,512.29 | 12/17/2001 - SD | 6,096 | $22.52 | $137,257.84 | |
| Plumbers and Pipefitters National Pension Fund | 02/17/2005 | 17,104 | $23.06 | $394,401.14 | 12/17/2001 - SD | 17,104 | $22.52 | $385,114.50 | |
| Plumbers and Pipefitters National Pension Fund | 02/17/2005 | 700 | $23.06 | $16,141.30 | 12/18/2001 - SD | 700 | $20.27 | $14,190.76 | |
| Plumbers and Pipefitters National Pension Fund | 02/17/2005 | 6,400 | $23.06 | $147,577.60 | 12/18/2001 - SD | 6,400 | $19.90 | $127,387.75 | |
| Plumbers and Pipefitters National Pension Fund | 02/17/2005 | 7,600 | $23.06 | $175,248.40 | 12/19/2001 - SD | 7,600 | $19.36 | $147,125.01 | |
| Plumbers and Pipefitters National Pension Fund | 02/17/2005 | 8,200 | $23.06 | $189,083.80 | 12/26/2001 - SD | 8,200 | $20.51 | $168,214.11 | |
| Plumbers and Pipefitters National Pension Fund | 02/17/2005 | 3,100 | $23.06 | $71,482.90 | 01/10/2002 - SD | 3,100 | $27.09 | $83,963.78 | |
| Plumbers and Pipefitters National Pension Fund | 02/17/2005 | 100 | $23.06 | $2,305.90 | 01/11/2002 - SD | 100 | $26.70 | $2,670.45 | |
| Plumbers and Pipefitters National Pension Fund | 02/17/2005 | 2,400 | $23.06 | $55,341.60 | 01/11/2002 - SD | 2,400 | $26.53 | $63,664.80 | |
| Plumbers and Pipefitters National Pension Fund | 02/17/2005 | 1,500 | $23.06 | $34,588.50 | 01/15/2002 - SD | 1,500 | $27.42 | $41,122.93 | |
| Plumbers and Pipefitters National Pension Fund | 02/17/2005 | 1,600 | $23.06 | $36,894.40 | 01/15/2002 - SD | 1,600 | $27.57 | $44,114.37 | |
| Plumbers and Pipefitters National Pension Fund | 02/17/2005 | 7,100 | $23.06 | $163,718.90 | 01/15/2002 - SD | 7,100 | $27.49 | $195,154.06 | |
| Plumbers and Pipefitters National Pension Fund | 02/17/2005 | 4,096 | $23.06 | $94,449.66 | 01/15/2002 - SD | 4,096 | $24.45 | $100,163.72 | |
| Plumbers and Pipefitters National Pension Fund | 09/29/2003 - SD | 3,904 | $14.76 | $57,640.22 | 01/15/2002 - SD | 3,904 | $24.45 | $95,468.54 | |
| Plumbers and Pipefitters National Pension Fund | 09/29/2003 - SD | 1,300 | $14.76 | $19,193.72 | 01/16/2002 - SD | 1,300 | $24.24 | $31,510.87 | |
| Plumbers and Pipefitters National Pension Fund | 09/29/2003 - SD | 3,471 | $14.76 | $51,247.23 | 02/27/2002 - SD | 3,471 | $16.06 | $55,748.97 | |
| Plumbers and Pipefitters National Pension Fund | 06/30/2003 - SD | 7,575 | $15.14 | $114,653.69 | 02/27/2002 - SD | 7,575 | $16.06 | $121,664.79 | |
| Plumbers and Pipefitters National Pension Fund | 06/02/2003 - SD | 10,100 | $14.49 | $146,312.64 | 02/27/2002 - SD | 10,100 | $16.06 | $162,219.72 | |
| Plumbers and Pipefitters National Pension Fund | 05/30/2003 - SD | 1,204 | $14.31 | $17,224.06 | 02/27/2002 - SD | 1,204 | $16.06 | $19,337.87 | |
| Plumbers and Pipefitters National Pension Fund | 05/30/2003 - SD | 20,471 | $14.31 | $292,851.99 | 02/27/2002 - SD | 20,471 | $15.81 | $323,617.08 | |
| Plumbers and Pipefitters National Pension Fund | 03/03/2003 - SD | 5,945 | $9.65 | $57,388.87 | 02/27/2002 - SD | 5,945 | $15.81 | $93,981.90 | |
| Plumbers and Pipefitters National Pension Fund | 02/28/2003 - SD | 7,630 | $9.59 | $73,202.22 | 02/27/2002 - SD | 7,630 | $15.81 | $120,619.33 | |
| Plumbers and Pipefitters National Pension Fund | 02/27/2003 - SD | 3,754 | $9.73 | $36,527.92 | 02/27/2002 - SD | 3,754 | $15.81 | $59,345.34 | |
| Plumbers and Pipefitters National Pension Fund | 02/27/2003 - SD | 800 | $9.73 | $7,784.32 | 03/15/2002 - SD | 800 | $13.95 | $11,159.83 | |
| Plumbers and Pipefitters National Pension Fund | 02/27/2003 - SD | 7,051 | $9.73 | $68,609.05 | 03/18/2002 - SD | 7,051 | $12.66 | $89,253.74 | |
| Plumbers and Pipefitters National Pension Fund | 02/26/2003 - SD | 7,549 | $9.60 | $72,438.69 | 03/18/2002 - SD | 7,549 | $12.66 | $95,557.57 | |
| Plumbers and Pipefitters National Pension Fund | 02/26/2003 - SD | 3,801 | $9.60 | $36,473.64 | 03/18/2002 - SD | 3,801 | $12.36 | $46,969.39 | |
| Plumbers and Pipefitters National Pension Fund | 12/27/2002 - SD | 1,570 | $10.22 | $16,052.47 | 03/18/2002 - SD | 1,570 | $12.36 | $19,400.67 | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Plumbers and Pipefitters National Pension Fund | 08/09/2002 - SD | 6,700 | $7.85 | $52,603.71 | 03/18/2002 - SD | 6,700 | $12.36 | $82,792.66 | |
| Plumbers and Pipefitters National Pension Fund | 08/08/2002 - SD | 1,500 | $7.66 | $11,491.20 | 03/18/2002 - SD | 1,500 | $12.36 | $18,535.67 | |
| Plumbers and Pipefitters National Pension Fund | 07/30/2002 - SD | 8,300 | $7.95 | $66,021.52 | 03/18/2002 - SD | 8,300 | $12.36 | $102,564.04 | |
| Plumbers and Pipefitters National Pension Fund | 07/26/2002 - SD | 2,829 | $8.36 | $23,641.95 | 03/18/2002 - SD | 2,829 | $12.36 | $34,958.27 | |
| Plumbers and Pipefitters National Pension Fund | 07/26/2002 - SD | 7,471 | $8.36 | $62,435.15 | 04/03/2002 - SD | 7,471 | $12.99 | $97,028.89 | |
| Plumbers and Pipefitters National Pension Fund | 07/16/2002 - SD | 3,529 | $9.00 | $31,761.00 | 04/03/2002 - SD | 3,529 | $12.99 | $45,832.55 | |
| Plumbers and Pipefitters National Pension Fund | 07/16/2002 - SD | 1,071 | $9.00 | $9,639.00 | 06/11/2002 - SD | 1,071 | $10.15 | $10,874.71 | |
| Plumbers and Pipefitters National Pension Fund | 07/15/2002 - SD | 4,629 | $8.72 | $40,383.40 | 06/11/2002 - SD | 4,629 | $10.15 | $47,001.90 | |
| Plumbers and Pipefitters National Pension Fund | 07/15/2002 - SD | 1,771 | $8.72 | $15,450.20 | 06/12/2002 - SD | 1,771 | $10.00 | $17,717.61 | |
| Plumbers and Pipefitters National Pension Fund | 07/12/2002 - SD | 129 | $8.83 | $1,139.57 | 06/12/2002 - SD | 129 | $10.00 | $1,290.55 | |
| Plumbers and Pipefitters National Pension Fund | 07/12/2002 - SD | 3,100 | $8.83 | $27,385.09 | 06/12/2002 - SD | 3,100 | $10.05 | $31,140.72 | |
| Plumbers and Pipefitters National Pension Fund | 07/12/2002 - SD | 2,500 | $8.83 | $22,084.75 | 06/13/2002 - SD | 2,500 | $10.23 | $25,564.97 | |
| Plumbers and Pipefitters National Pension Fund | 07/12/2002 - SD | 400 | $8.83 | $3,533.56 | 06/14/2002 - SD | 400 | $10.48 | $4,190.67 | |
| Plumbers and Pipefitters National Pension Fund | 07/12/2002 - SD | 71 | $8.83 | $627.21 | 06/28/2002 - SD | 71 | $10.06 | $714.24 | |
| Plumbers and Pipefitters National Pension Fund | 03/22/2002 - SD | 229 | $13.47 | $3,085.75 | 06/28/2002 - SD | 229 | $10.06 | $2,303.66 | |
| Plumbers and Pipefitters National Pension Fund | 03/22/2002 - SD | 2,400 | $13.47 | $32,339.76 | 07/02/2002 - SD | 2,400 | $9.31 | $22,335.64 | |
| Plumbers and Pipefitters National Pension Fund | 03/22/2002 - SD | 2,121 | $13.47 | $28,580.27 | 12/24/2002 - SD | 2,121 | $9.43 | $20,008.48 | |
| Plumbers and Pipefitters National Pension Fund | 01/10/2002 - SD | 7,600 | $27.09 | $205,877.16 | 12/24/2002 - SD | 7,600 | $9.43 | $71,694.71 | |
| Plumbers and Pipefitters National Pension Fund | 01/02/2002 - SD | 379 | $22.55 | $8,546.45 | 12/24/2002 - SD | 379 | $9.43 | $3,575.30 | |
| Plumbers and Pipefitters National Pension Fund | 01/02/2002 - SD | 6,700 | $22.55 | $151,085.00 | 01/02/2003 - SD | 6,700 | $10.15 | $68,033.09 | |
| Plumbers and Pipefitters National Pension Fund | 01/02/2002 - SD | 4,300 | $22.55 | $96,965.00 | 01/03/2003 - SD | 4,300 | $9.93 | $42,690.39 | |
| Plumbers and Pipefitters National Pension Fund | 01/02/2002 - SD | 8,100 | $22.55 | $182,655.00 | 01/07/2003 - SD | 8,100 | $9.78 | $79,205.88 | |
| Plumbers and Pipefitters National Pension Fund | 01/02/2002 - SD | 2,500 | $22.55 | $56,375.00 | 02/14/2003 - SD | 2,500 | $9.27 | $23,184.29 | |
| Plumbers and Pipefitters National Pension Fund | 01/02/2002 - SD | 3,500 | $22.55 | $78,925.00 | 02/18/2003 - SD | 3,500 | $8.97 | $31,408.40 | |
| Plumbers and Pipefitters National Pension Fund | 01/02/2002 - SD | 1,300 | $22.55 | $29,315.00 | 02/19/2003 - SD | 1,300 | $8.70 | $11,307.96 | |
| Plumbers and Pipefitters National Pension Fund | 01/02/2002 - SD | 3,900 | $22.55 | $87,945.00 | 02/20/2003 - SD | 3,900 | $8.78 | $34,253.05 | |
| Plumbers and Pipefitters National Pension Fund | 01/02/2002 - SD | 4,000 | $22.55 | $90,200.00 | 02/21/2003 - SD | 4,000 | $9.27 | $37,068.88 | |
| Plumbers and Pipefitters National Pension Fund | 01/02/2002 - SD | 1,170 | $22.55 | $26,383.50 | 02/24/2003 - SD | 1,170 | $9.10 | $10,644.21 | |
| Plumbers and Pipefitters National Pension Fund | 01/02/2002 - SD | 4,951 | $22.55 | $111,645.05 | 02/20/2004 | 4,951 | $18.41 | $91,123.16 | |
| Plumbers and Pipefitters National Pension Fund | 12/27/2001 - SD | 7,975 | $20.61 | $164,363.95 | 02/20/2004 | 7,975 | $18.41 | $146,779.88 | |
| Plumbers and Pipefitters National Pension Fund | 12/26/2001 - SD | 3,775 | $20.51 | $77,417.70 | 02/20/2004 | 3,775 | $18.41 | $69,478.88 | |
| Plumbers and Pipefitters National Pension Fund | 10/30/2001 - SD | 200 | $15.75 | $3,149.42 | 02/20/2004 | 200 | $18.41 | $3,681.00 | |
| Plumbers and Pipefitters National Pension Fund | 10/29/2001 - SD | 7,800 | $16.77 | $130,795.86 | 02/20/2004 | 7,800 | $18.41 | $143,559.00 | |
| Plumbers and Pipefitters National Pension Fund | 10/26/2001 - SD | 1,400 | $15.86 | $22,197.00 | 02/20/2004 | 1,400 | $18.41 | $25,767.00 | |
| Plumbers and Pipefitters National Pension Fund | 10/26/2001 - SD | 1,400 | $16.10 | $22,533.00 | 02/20/2004 | 1,400 | $18.41 | $25,767.00 | |
| Plumbers and Pipefitters National Pension Fund | 10/25/2001 - SD | 6,500 | $15.85 | $103,041.25 | 02/20/2004 | 6,500 | $18.41 | $119,632.50 | |
| Plumbers and Pipefitters National Pension Fund | 10/11/2001 - SD | 1,900 | $20.77 | $39,463.00 | 02/20/2004 | 1,900 | $18.41 | $34,969.50 | |
| Plumbers and Pipefitters National Pension Fund | 10/11/2001 - SD | 6,550 | $19.84 | $129,972.31 | 02/20/2004 | 6,550 | $18.41 | $120,552.75 | |
| Plumbers and Pipefitters National Pension Fund | 10/10/2001 - SD | 1,900 | $21.40 | $40,660.00 | 02/20/2004 | 1,900 | $18.41 | $34,969.50 | |
| Plumbers and Pipefitters National Pension Fund | 10/09/2001 - SD | 500 | $19.99 | $9,995.00 | 02/20/2004 | 500 | $18.41 | $9,202.50 | |
| Plumbers and Pipefitters National Pension Fund | 10/05/2001 - SD | 3,174 | $17.92 | $56,863.48 | 02/20/2004 | 3,174 | $18.41 | $58,417.47 | |
| Plumbers and Pipefitters National Pension Fund | 10/05/2001 - SD | 170 | $17.92 | $3,045.62 | 03/03/2006 - SD | 170 | $28.71 | $4,881.39 | |
| **Subtotal for Shares Bought and Sold Within Class Period** | | **362,315** | | **$6,617,028.06** | | **362,315** | | **$6,257,912.82** | **($359,115.24)** |
| | | | | | | | | | |
| Plumbers and Pipefitters National Pension Fund | 10/05/2001 - SD | 8,056 | $17.92 | $144,326.46 | held | 8,056 | $22.38 | $180,326.79 | |
| Plumbers and Pipefitters National Pension Fund | 09/06/2001 - SD | 500 | $25.79 | $12,896.35 | held | 500 | $22.38 | $11,192.08 | |
| Plumbers and Pipefitters National Pension Fund | 09/05/2001 - SD | 1,600 | $25.70 | $41,125.92 | held | 1,600 | $22.38 | $35,814.65 | |
| Plumbers and Pipefitters National Pension Fund | 09/05/2001 - SD | 4,600 | $25.65 | $117,972.06 | held | 4,600 | $22.38 | $102,967.13 | |
| Plumbers and Pipefitters National Pension Fund | 09/04/2001 - SD | 800 | $26.01 | $20,808.00 | held | 800 | $22.38 | $17,907.33 | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Plumbers and Pipefitters National Pension Fund | 09/04/2001 - SD | 800 | $26.03 | $20,827.68 | held | 800 | $22.38 | $17,907.33 | |
| Plumbers and Pipefitters National Pension Fund | 09/04/2001 - SD | 1,900 | $26.36 | $50,078.30 | held | 1,900 | $22.38 | $42,529.90 | |
| Plumbers and Pipefitters National Pension Fund | 08/06/2001 - SD | 200 | $29.25 | $5,850.86 | held | 200 | $22.38 | $4,476.83 | |
| Plumbers and Pipefitters National Pension Fund | 08/03/2001 - SD | 2,300 | $28.69 | $65,990.45 | held | 2,300 | $22.38 | $51,483.57 | |
| Plumbers and Pipefitters National Pension Fund | 08/02/2001 - SD | 1,200 | $28.26 | $33,912.00 | held | 1,200 | $22.38 | $26,860.99 | |
| Plumbers and Pipefitters National Pension Fund | 08/01/2001 - SD | 1,400 | $28.56 | $39,981.20 | held | 1,400 | $22.38 | $31,337.82 | |
| Plumbers and Pipefitters National Pension Fund | 08/01/2001 - SD | 2,500 | $28.61 | $71,525.00 | held | 2,500 | $22.38 | $55,960.40 | |
| Plumbers and Pipefitters National Pension Fund | 07/31/2001 - SD | 1,600 | $27.91 | $44,648.80 | held | 1,600 | $22.38 | $35,814.65 | |
| Plumbers and Pipefitters National Pension Fund | 07/30/2001 - SD | 2,500 | $26.91 | $67,285.75 | held | 2,500 | $22.38 | $55,960.40 | |
| Plumbers and Pipefitters National Pension Fund | 07/27/2001 - SD | 4,000 | $26.85 | $107,401.20 | held | 4,000 | $22.38 | $89,536.64 | |
| Plumbers and Pipefitters National Pension Fund | 07/26/2001 - SD | 3,100 | $26.48 | $82,090.17 | held | 3,100 | $22.38 | $69,390.89 | |
| Plumbers and Pipefitters National Pension Fund | 07/25/2001 - SD | 1,600 | $26.00 | $41,600.00 | held | 1,600 | $22.38 | $35,814.65 | |
| Plumbers and Pipefitters National Pension Fund | 07/23/2001 - SD | 5,300 | $24.31 | $128,825.51 | held | 5,300 | $22.38 | $118,636.04 | |
| Plumbers and Pipefitters National Pension Fund | 07/18/2001 - SD | 5,200 | $26.00 | $135,183.36 | held | 5,200 | $22.38 | $116,397.63 | |
| Plumbers and Pipefitters National Pension Fund | 07/17/2001 - SD | 4,900 | $26.40 | $129,367.35 | held | 4,900 | $22.38 | $109,682.38 | |
| Plumbers and Pipefitters National Pension Fund | 07/16/2001 - SD | 1,200 | $29.25 | $35,100.00 | held | 1,200 | $22.38 | $26,860.99 | |
| Plumbers and Pipefitters National Pension Fund | 07/16/2001 - SD | 5,700 | $24.35 | $138,776.76 | held | 5,700 | $22.38 | $127,589.71 | |
| Plumbers and Pipefitters National Pension Fund | 07/16/2001 - SD | 47,100 | $25.64 | $1,207,422.63 | held | 47,100 | $22.38 | $1,054,293.89 | |
| Plumbers and Pipefitters National Pension Fund | 07/13/2001 - SD | 8,000 | $39.08 | $312,640.00 | held | 8,000 | $22.38 | $179,073.27 | |
| Plumbers and Pipefitters National Pension Fund | 07/12/2001 - SD | 5,600 | $45.28 | $253,550.64 | held | 5,600 | $22.38 | $125,351.29 | |
| Plumbers and Pipefitters National Pension Fund | 06/22/2001 - SD | 400 | $54.87 | $21,947.00 | held | 400 | $22.38 | $8,953.66 | |
| Plumbers and Pipefitters National Pension Fund | 06/21/2001 - SD | 1,100 | $55.81 | $61,394.74 | held | 1,100 | $22.38 | $24,622.58 | |
| Plumbers and Pipefitters National Pension Fund | 06/05/2001 - SD | 3,600 | $58.83 | $211,789.44 | held | 3,600 | $22.38 | $80,582.97 | |
| Plumbers and Pipefitters National Pension Fund | 06/04/2001 - SD | 2,600 | $57.00 | $148,193.50 | held | 2,600 | $22.38 | $58,198.81 | |
| Plumbers and Pipefitters National Pension Fund | 06/01/2001 - SD | 4,900 | $58.54 | $286,844.53 | held | 4,900 | $22.38 | $109,682.38 | |
| Plumbers and Pipefitters National Pension Fund | 06/01/2001 - SD | 11,800 | $59.24 | $699,009.58 | held | 11,800 | $22.38 | $264,133.08 | |
| Plumbers and Pipefitters National Pension Fund | 05/31/2001 - SD | 1,800 | $64.12 | $115,416.18 | held | 1,800 | $22.38 | $40,291.49 | |
| Plumbers and Pipefitters National Pension Fund | 05/30/2001 - SD | 1,200 | $63.33 | $75,990.00 | held | 1,200 | $22.38 | $26,860.99 | |
| Plumbers and Pipefitters National Pension Fund | 05/30/2001 - SD | 2,300 | $63.55 | $146,154.19 | held | 2,300 | $22.38 | $51,483.57 | |
| Plumbers and Pipefitters National Pension Fund | 05/29/2001 - SD | 800 | $63.65 | $50,916.00 | held | 800 | $22.38 | $17,907.33 | |
| Plumbers and Pipefitters National Pension Fund | 05/29/2001 - SD | 7,600 | $64.02 | $486,533.00 | held | 7,600 | $22.38 | $170,119.61 | |
| Plumbers and Pipefitters National Pension Fund | 05/25/2001 - SD | 5,000 | $65.81 | $329,034.50 | held | 5,000 | $22.38 | $111,920.80 | |
| Plumbers and Pipefitters National Pension Fund | 05/24/2001 - SD | 400 | $65.91 | $26,364.00 | held | 400 | $22.38 | $8,953.66 | |
| Plumbers and Pipefitters National Pension Fund | 05/24/2001 - SD | 500 | $66.35 | $33,175.00 | held | 500 | $22.38 | $11,192.08 | |
| Plumbers and Pipefitters National Pension Fund | 05/23/2001 - SD | 6,500 | $65.56 | $426,147.15 | held | 6,500 | $22.38 | $145,497.03 | |
| | | | | | | | | | |
| **Subtotal for Shares Held at the End of Class Period** | | **172,156** | | **$6,428,095.26** | | **172,156** | | **$3,853,567.29** | **($2,574,527.97)** |
| | | | | | | | | | |
| **Movant's Total For All Shares Acquired in Class Period** | | **534,471** | | **$13,045,123.32** | | **534,471** | | **$10,111,480.12** | **($2,933,643.21)** |
| | | | | | | | | | |
| | | | | | | | | | |
| *For shares held at the end of the class period, damages are calculated | | | | | | | | | |
| by multiplying the shares held by the average share price during the 90 | | | | | | | | | |
| calendar days after the end of the class period.  The price used is $22.38 | | | | | | | | | |
| as of June 16, 2006. | | | | | | | | | |
| | | | | | | | | | |
| Settlement dates are indicated with "SD" attached to the date. | | | | | | | | | |

Mar 27 08 11:35a

REDACTED

Statement for Account # 787-8902854
07/01/07 - 09/30/07

## Positions Closed This Period

| Investment Description | Account Type | Symbol/ CUSIP | Quantity | Purchase Date | Cost Basis | Sale Date | Sales Proceeds | Realized Gain(Loss) | % Gain(Loss) |
|---|---|---|---|---|---|---|---|---|---|
| Sunopta Inc Com | Margin | STKL | 1,000 | | $ - | 09/11/07 | $ 14,049.78 | | |
| Sunopta Inc Com | Margin | STKL | 9,690 | | | 09/11/07 | 136,045.51 | $ | |
| Total | | | | | $0.00 | | $150,095.29 | $0.00 | |

page 3 of 6

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
CHRISTOPHER P. SEEFER (201197)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
chriss@csgrr.com
     – and –
DARREN J. ROBBINS (168593)
RAMZI ABADOU (222567)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ramzia@csgrr.com

[Proposed] Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| In re VERIFONE HOLDINGS, INC. SECURITIES LITIGATION | ) ) ) | Master File No. 3:07-cv-06140-MHP |
|---|---|---|
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | NOTICE OF SUPPLEMENTAL AUTHORITY |
|     ALL ACTIONS. | ) ) ) | |

1    The National Elevator Industry Pension Fund (the "National Elevator Fund") respectfully

2   submits the following two decisions from district courts in the Ninth Circuit discussing the propriety

3   of appointing "groups" like those presently before the Court as lead plaintiffs under the Private

4   Securities Litigation Reform Act of 1995 ("PSLRA").  In particular, the National Elevator Fund

5   directs the Court's attention to *Tsirekidze v. Syntax-Brillian Corp.*, where the court appointed a sole

6   institutional investor like the National Elevator Fund over three groups with larger losses.  *See*

7   *Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-2204-PHX-FJM, Order at 7 (D. Ariz. Apr. 4, 2008)

8   (attached hereto as Ex. A); *In re Atlas Mining Co. Sec. Litig.*, 2008 U.S. Dist LEXIS 24201, at *13-

9   *16 (D. Idaho Mar. 25, 2008) (finding that groups must rise or fall as groups) (attached hereto as

10  Ex. B) ("When a group does not have a pre-existing relationship, appointing that group as lead

11  plaintiff would not best serve the class.  It would also defeat the PSLRA's purpose to prevent

12  lawyer-driven litigation."); *see also Steinberg v. Ericson LM Tel. Co.*, 07-CV-9615 (RPP), Hearing

13  Transcript at 3-5, 8-12, 16-21, 60-63 (S.D.N.Y. Feb. 15, 2008) (attached hereto as Ex. C) (rejecting

14  group of foreign institutional investors and doubting *res judicata* effect of court's judgment).

15  DATED:  April 8, 2008                Respectfully submitted,

16                                       COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
17                                       DARREN J. ROBBINS
                                         RAMZI ABADOU

18

19                                       _____
                                                s/ Ramzi Abadou
20                                            RAMZI ABADOU

21                                       655 West Broadway, Suite 1900
                                         San Diego, CA  92101
22                                       Telephone:  619/231-1058
                                         619/231-7423 (fax)
23
                                         COUGHLIN STOIA GELLER
24                                         RUDMAN & ROBBINS LLP
                                         CHRISTOPHER P. SEEFER
25                                       100 Pine Street, Suite 2600
                                         San Francisco, CA  94111
26                                       Telephone:  415/288-4545
                                         415/288-4534 (fax)
27
                                         [Proposed] Lead Counsel for Plaintiffs
28  S:\CasesSD\Verifone 07\NOT00050466-Authority.doc

NOTICE OF SUPPLEMENTAL AUTHORITY - 3:07-cv-06140-MHP                                    - 1 -

1

<u>CERTIFICATE OF SERVICE</u>

2

    I hereby certify that on April 8, 2008, I electronically filed the foregoing with the Clerk of the

3

Court using the CM/ECF system which will send notification of such filing to the e-mail addresses

4

denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the

5

foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

6

indicated on the attached Manual Notice List.

7

    I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on April 8, 2008.

9

10

                      s/ Ramzi Abadou
                      RAMZI ABADOU

11

                      COUGHLIN STOIA GELLER

12

                           RUDMAN & ROBBINS LLP
                      655 West Broadway, Suite 1900

13

                      San Diego, CA  92101-3301
                      Telephone:  619/231-1058

14

                      619/231-7423 (fax)

15

                      E-mail: ramzia@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:07-cv-06140-MHP

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzia@csgrr.com,debh@csgrr.com

- **Francis A. Bottini , Jr**
  frankb@johnsonbottini.com

- **Martin D. Chitwood**
  MChitwood@chitwoodlaw.com,SRubinstein@chitwoodlaw.com,ZBanks@chitwoodlaw.com,ERu

- **Brendan P. Cullen**
  cullenb@sullcrom.com,carrejoa@sullcrom.com

- **Aaron H. Darsky**
  adarsky@schubert-reed.com

- **Timothy Alan DeLange**
  kristinas@blbglaw.com,timothyd@blbglaw.com

- **Daniel C. Girard**
  girardgibbs@girardgibbs.com,cma@girardgibbs.com

- **Stanley M. Grossman**
  smgrossman@pomlaw.com

- **Willem F. Jonckheer**
  wjonckheer@schubert-reed.com

- **Darren T. Kaplan**
  dkaplan@chitwoodlaw.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Gregory E. Keller**
  gkeller@chitwoodlaw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **Jonathan Krasne Levine**
  jkl@girardgibbs.com,mav@girardgibbs.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Mark Cotten Molumphy**
  mmolumphy@cpmlegal.com,oszeto@cpmlegal.com,pskahan@cpmlegal.com,jacosta@cpmlegal.c

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Juden Justice Reed**
  jreed@schubert-reed.com,plee@schubert-reed.com,akeng@schubert-reed.com,rschubert@schubert-reed.com

- **Eran Rubinstein**
  erubinstein@chitwoodlaw.com

- **Susan Boltz Rubinstein**
  srubinstein@chitwoodlaw.com

- **Aaron M. Sheanin**
  ams@girardgibbs.com,amv@girardgibbs.com,ace@girardgibbs.com

- **Michael Howard Steinberg**
  steinbergm@sullcrom.com

- **Steven Noel Williams**
  swilliams@cpmlegal.com,jverducci@cpmlegal.com,dburwell@cpmlegal.com,cwalker@cpmlegal.

- **James M. Wilson**
  JWilson@chiwoodlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# EXHIBIT A

1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9   Teimuraz Tsirekidze, On Behalf of )  No. CV-07-2204-PHX-FJM
    Himself and All Others Similarly Situated,)
10                                        )  **ORDER**
                        Plaintiff,       )
11                                        )
    vs.                                   )
12                                        )
                                          )
13  Syntax–Brillian Corp., Vincent F. Sollitto,)
    Jr., and Wayne Pratt,                 )
14                                        )
                        Defendants.       )
15                                        )
    _____)  **CONSOLIDATING**
16

17  The Nagel Family Trust, On Behalf of )  No. CV-07-2454-PHX-ROS
    Itself and All Others Similarly Situated, )
18                                        )
                        Plaintiff,       )
19                                        )
    vs.                                   )
20                                        )
    Syntax–Brillian Corp. A.K.A. Olevia )
21  International Group, Inc., Vincent F.)
    Sollitto, Jr., James Ching Hua Li, Man Kit )
22  (Thomas) Chow, and Wayne Pratt,       )
                                          )
23                      Defendants.       )
                                          )
24  _____)  [caption continued on following page]

25

26

27

28

1   Angelko Bogdanov, On Behalf of Himself)    No. CV-07-2524-PHX-ROS
    and All Others Similarly Situated,       )
2                                            )
           Plaintiff,                        )
3                                            )
    vs.                                      )
4                                            )
                                             )
5   Syntax–Brillian Corp., Vincent F. Sollitto,)
    Jr., James Li, and Wayne Pratt,          )
6                                            )
           Defendants.                       )
7                                            )
    _____)
8

9   Paula Langley, Individually and On Behalf)    No. CV-07-2525-PHX-SRB
    of All Others Similarly Situated,        )
10                                           )
           Plaintiff,                        )
11                                           )
    vs.                                      )
12                                           )
                                             )
13  Syntax–Brillian Corp., Vincent F. Sollitto,)
    Jr., and Wayne Pratt,                    )
14                                           )
           Defendants.                       )
15                                           )
    _____)
16

17

18

19         Four securities class actions have been filed in this district against defendant

20  Syntax–Brillian Corp. and several of its officers.  Five members of the proposed class now

21  move for consolidation of the actions, for appointment as lead plaintiff, and for approval of

22  lead counsel.  The court has before it the following documents:  Syntax Investor Group's

23  motion, (doc. 6), supporting memorandum (doc. 7), memorandum in response to competing

24  motions (doc. 27), and reply in further support of its own (doc. 36); the McCullough

25  Family's motion (doc. 23), supporting memorandum (doc. 8), supporting declaration of

26  Gustavo Bruckner (doc. 9), response to competing motions (doc. 28), and reply in further

27  support of its own (doc. 37); Angelko Bogdanov, John Gardini, and Bloomfield, Inc.'s

28  motion (doc. 11), supporting memorandum (doc. 12), and supporting declaration of Frank

1   Verdame (doc. 14);[1] the Farrukh Group's motion and supporting memorandum (doc. 15),

2   response to competing motions (doc. 30), and reply in support of its own (doc. 38); and the

3   City of St. Clair Shores Police and Fire Retirement System's motion (doc. 17), supporting

4   memorandum (doc. 18), supporting declaration of Michael Salcido (doc. 19), response to

5   competing motions (doc. 32), and reply in further support of its own (doc. 40).

6                                                    **I**

7          All four complaints name as defendants Syntax–Brillian Corp. ("Syntax"), a

8   manufacturer and distributor of high definition televisions based in Tempe, Arizona; Vincent

9   Sollitto, Jr., who is chairman of the company's board of directors and served as chief

10  executive officer until September 30, 2007; and Wayne Pratt, who was the company's chief

11  financial officer and vice president until September 30, 2007.  Two of the complaints name

12  additional defendants.  One adds James Ching Hua Li, a company director who became

13  chief executive officer in October 2007;[2] the other adds James Ching Hua Li as well as

14  Man Kit Chow, the company's executive vice president and chief procurement officer.[3]

15         All four complaints seek recovery under Sections 10(b) and 20(a) of the Securities and

16  Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t (2006).  Plaintiffs allege that defendants

17  overstated profits and projections, concealed shortfalls, and otherwise misled investors,

18  which caused an artificial inflation of Syntax stock price.  The complaints propose a class of

19  investors who suffered losses when the stock dropped precipitously on September 13, 2007,

20  following a company announcement that Syntax revenues were much lower than anticipated.

21  Three complaints propose essentially the same "class period"—that the class be open to those

22

23

24  ────────────────

25         [1]  The court also has before it the Bogdanov Group's supporting memorandum that

26  appears only on the docket of No. CV-07-2524-PHX-ROS (doc. 41).

27         [2]  No. CV-07-2524-PHX-ROS

28         [3]  No. CV-07-2454-PHX-ROS

                                                  - 3 -

who acquired Syntax stock roughly between May 1, 2007, and September 13, 2007.  One complaint proposes a longer class period, February 9, 2007, to November 14, 2007.[4]

## II

Under Rule 42, Fed. R. Civ. P., we may consolidate "actions involving a common question of law or fact."  The complaints in these four actions are nearly identical, and the minor differences in proposed class periods and named individual defendants are not obstacles to consolidation.  Olsen v. N.Y. Comm. Bancorp, Inc., 233 F.R.D. 101, 104–105 (E.D.N.Y. 2005).  Therefore, the motions to consolidate are granted.

The method for appointing a lead plaintiff in a securities class action is governed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 (2006).  The party who files the action must publicize its pendency, the proposed class period, and the nature of the claims.  § 78u-4(a)(3)(A)(i).  The publication must also inform potential class members that they have 60 days to come forward and move to be appointed lead plaintiff.  § 78u-4(a)(3)(A)(ii).  If, as here, multiple class actions are brought asserting substantially the same claims, publication is required only of the first to file, in this case Syntax Investor Group.  § 78u-4(a)(3)(A)(ii).  Once the 60-day window closes, the court determines the lead plaintiff ("most adequate plaintiff").

Under the PSLRA, the court "shall adopt a presumption that the most adequate plaintiff is the person or group of persons that . . . has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."  § 78u-4(a)(3)(B)(iii)(I).  Only two requirements of Rule 23, commonly referred to as "typicality" and "adequacy," are relevant to the selection of lead plaintiff.  In re Cavanaugh, 306 F.3d 726, 730 (9th Cir. 2002).  First, the claims or defenses of the lead plaintiff must be "typical of the claims or defenses of the class."  Second, the lead plaintiff must be able to "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(3)–(4).  Once the presumption is established, other potential lead

---

[4] No. CV-07-2524-PHX-ROS

plaintiffs may rebut it with proof that the "presumptively most adequate plaintiff" *does not* satisfy the two requirements of Rule 23. § 78u-4(a)(3)(B)(iii)(II). This perplexing statutory scheme suggests that the initial determination on typicality and adequacy "should be a product of the court's independent judgment, and that arguments by members of the purported plaintiff class . . . should be considered *only* in the context of assessing whether the presumption has been rebutted." In re Cendant Corp. Litig., 264 F.3d 201, 263–64 (3d. Cir. 2001).

Therefore, we must first rank potential lead plaintiffs in order of financial interest. Beginning with the potential lead plaintiff who has the greatest financial interest, we make a determination on typicality and adequacy, relying only on that party's "complaint and sworn certification." In re Cavanaugh, 306 F.3d at 730. If the party has made a prima facie showing of typicality and adequacy, that party becomes the presumptive lead plaintiff, and we then consider rebuttal evidence from competing movants for lead plaintiff. If the presumption is not rebutted, lead plaintiff is determined. If, however, the presumption is either not established or is successfully rebutted, we go back and consider the typicality and adequacy of the potential lead plaintiff who has the *next greatest* financial interest, proceeding so on until a lead plaintiff is found. Id. at 731.

Before applying the PSLRA approach, we note that its enactment was an effort by Congress to counteract the tendency of securities class actions to be "lawyer driven." Before PSLRA, lead plaintiff status generally went to the first to file. This resulted in a "race to the courthouse," and eager counsel rounded up "lead" plaintiffs who effectively exercised no control over the litigation. PSLRA's notice requirement slows the race and gives seriously interested class members an opportunity to step forward. The presumption in favor of the movant with the greatest financial interest (who satisfies Rule 23) assumes that a class member with much at stake, often a large institutional investor, will have the most incentive, and be in the best position, to actually exert influence over lead counsel. See id. at 729.

1
2
3
4
5
6

Though Congress has attempted to shift the balance with PSLRA, a review of the documents filed so far in this action makes clear that counsel have nonetheless succeeded in keeping themselves at the forefront of securities class actions. We have before us six inches of briefing that has precious little to do with the merits of the claim and less to do with the fitness of any class member to steer this litigation. What we have in abundance is unwelcome sniping among counsel.

7

### III

8
9
10
11
12
13
14

The potential lead plaintiffs must be ranked in terms of their "financial interest" in the litigation.[5] Courts have proposed several metrics by which to measure financial interest. Fortunately, there is little dispute among the parties on this point. The parties essentially agree to a ranking in terms of estimated financial loss as follows: 1) the Farrukh Group (about $ 300,000), 2) the McCullough Family (about $ 165,000), 3) the Syntax Investor's Group (about $155,000), 4) St. Clair Shores Police and Fire Retirement System ($28,800), and 5) the Bogdanov Group ($17,590).

15
16
17
18
19
20
21
22
23
24

To begin, we decide whether the Farrukh Group, the proposed lead plaintiff with the largest financial interest, satisfies the requirements of Rule 23 based on its motions and declarations. We note that a "district court has latitude as to what information it will consider in determining typicality and adequacy." In re Cavanaugh, 306 F.3d at 732. On the question of adequacy, we focus on the Farrukh Group's status as a "group." Although the PSLRA allows groups to serve as lead plaintiffs, "courts have uniformly refused to appoint as lead plaintiff groups of unrelated individuals, brought together for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff." In re Gemstar-TV Guide Int'l, Inc. Sec. Litig., 209 F.R.D. 447, 451 (C.D. Cal. 2002). For the most part, to "allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing

25
26
27
28

[5] Two of the parties who filed complaints, Paula Langley (CV-07-2525-PHX-SRB) and the Nagel Family Trust (CV-07-2454-PHX-ROS), have not moved to be appointed lead plaintiff, so we have no way to determine their financial interest.

1
2
3
4
5
6
7

a lead plaintiff." In re Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 157 (S.D.N.Y. 1997).

Such a group is unlikely to "fairly and adequately represent the class" because it is unlikely

to engage in the litigation in a meaningful way at all. Fed. R. Civ. P. 23(a)(4).  What is more,

when unrelated investors are cobbled together, the clear implication is that counsel, rather

than the parties, are steering the litigation.  See In re Donnkenny Inc. Sec. Litig., 171 F.R.D.

at 158  ("[With the PSLRA,] Congress hoped that the lead plaintiff would seek the lawyers,

rather than having the lawyers seek the lead plaintiff.").

8
9
10
11
12
13
14
15
16
17

From their papers, it appears that the Farrukh "Group" consists of three completely

unrelated individuals from different parts of the country.  There is no suggestion how they

plan to work together as a cohesive unit.  As far as we can tell, each individual has so far

participated only to the extent of signing his name onto a boilerplate "certification in support

of application of lead plaintiff."  See Motion of the Farrukh Group (doc. 15), Ex. A.  At one

point, the group suggests that we pluck one of its top-two constituents to serve as lead

plaintiff "if this Court does not appoint a group as the lead plaintiff."  Reply of the

Farrukh Group (doc. 38) at 6.  We decline to do so.  The Farrukh Group moved for lead

plaintiff as a group and will be evaluated as such.  The willingness to abandon the group only

suggests how loosely it was put together.

18
19
20
21
22
23
24
25
26
27

Given no evidence of cohesiveness, we are not convinced that the Farrukh Group will

adequately represent this class.  Cf. In re Northwestern Corp. Sec. Litig., 299 F. Supp. 2d

997, 1006 (D.S.D. 2003) (approved group had established a plan for conducting litigation,

including mechanisms to call meetings and resolve disagreements).  Even if the Farrukh

Group had established itself as presumptive lead plaintiff, there is rebuttal evidence.

Competing movant Syntax Investor Group has brought to our attention a "press release"

issued by the Farrukh Group's counsel the day before the lead-plaintiff window closed,

which "urges" Syntax investors to sign up with the firm.  Sytnax Investor Group's Reply

at 8–9.  All members of the Farrukh Group signed certifications in support of lead

plaintiff status the next day, January 15, 2008, the day lead plaintiff motions were due.

28

1

2

3

4

5

6

7

    The Farrukh Group does not contest that their participation was a product of counsel's "press release." They even suggest that their signing certifications on the same day (the day motions were due) is evidence of the group's cohesiveness. Farrukh Group's Response (doc. 30) at 9. We are not persuaded. Without determining the ethical implications of counsel's patent effort to solicit clients, we conclude that the Farrukh Group's formation runs directly contrary to the goals of the PSLRA—to reduce lawyer-driven litigation. The Farrukh Group will not be appointed lead plaintiff.

8

9

10

11

12

13

14

    Next, we turn to the McCullough Family group, which has the second greatest financial interest. Oddly, the group's principal member, Robert McCullough, Jr., was initially named as a member of a competing proposed lead plaintiff, the Syntax Investor Group. Syntax Investor Group's Motion (doc. 6), Ex. B. In his sworn declaration, McCullough states that he sent his lead-plaintiff certification to the wrong firm "in error." Memorandum of the McCullough Family (doc. 28), Ex. A. Such a blatant gaffe does not bode well for the adequacy of his group to lead this litigation.

15

16

17

18

19

20

21

22

23

24

25

26

    The McCullough Family also has difficulty under the typicality prong of Rule 23. Typicality is not satisfied when a proposed lead plaintiff is subject to a unique defense, which could become the focus of the litigation. Zenith Labs., Inc. v. Carter-Wallace, Inc., 530 F.2d 508, 512 (3d. Cir. 1976). A review of Robert McCullough, Jr.'s trading history reveals that he was unusually active, making as many as 80 separate transactions of Syntax-Brillian stock in a single day. Declaration of Gustavo Bruckner (doc. 9), Ex. 3. Such a high-volume day trader might be subject to the unique defense that frantic trading belies any true reliance on company reports or even on the integrity of the stock price itself. See In re Safeguard Scientifics, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (noting that day traders often focus on technical price movements rather than price). While a day trader is not ipso facto disqualified from the lead plaintiff role, McCullough's unique trading pattern combined with questions about adequacy establish that his group should not represent the class.

27

28

Next in terms of financial interest is the Syntax Investor Group. This group fails the adequacy prong of Rule 23 for much the same reason as the Farrukh Group. There is simply no evidence that this "group" has a meaningful connection. The group's lack of cohesion is clearly evidenced by the fact, mentioned above, that its initial motion included Robert McCullough, Jr. as a member, even though he had retained separate counsel and was soon filing competing motions of his own.

We next turn to the City of St. Clair Shores Police and Fire Retirement System ("St. Clair"). This is the first group that satisfies both prongs of Rule 23. The opposing movants make no argument against St. Clair other than pointing out its relatively low financial stake in the litigation. But we have thoroughly applied the In re Cavanaugh test, and St. Clair is the first to meet its standards. We are especially encouraged that the client is a public retirement fund and thus more likely to control counsel. We have reviewed St. Clair's proposal of Coughlin Stoia Geller Rudman & Robbins, LLP, as its proposed lead counsel, and Buckley King as its proposed liaison counsel. We conclude that these firms are more than capable of conducting this litigation in the best interests of the class.

Finally, the Bogdanov Group will not be appointed lead plaintiff because the group has less of a financial interest than St. Clair. The Bogdanov Group's contention that one of its constituents is uniquely capable of bringing certain claims is without merit.

**IV**

Accordingly, **IT IS HEREBY ORDERED** that St. Clair's motion for consolidation, appointment as lead plaintiff, and approval of counsel (doc. 17) is granted in full. **IT IS FURTHER ORDERED** that all other motions (docs. 6, 11, 15 & 23) are **GRANTED** insofar as they move for consolidation, but are otherwise **DENIED**.

DATED this 4th day of April, 2008.

_Frederick J. Martone_
_____
Frederick J. Martone
United States District Judge

- 9 -

EXHIBIT B

LEXSEE 2008 U.S. DIST. LEXIS 24201

### IN RE ATLAS MINING COMPANY SECURITIES LITIGATION

### Case No. CV 07-428-N-EJL-MHW

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

### *2008 U.S. Dist. LEXIS 24201*

### March 25, 2008, Decided
### March 25, 2008, Filed

**COUNSEL:** **[\*1]** For Jeff Benson, Plaintiff: Laurence M. Rosen, LEAD ATTORNEY, PRO HAC VICE, Rosen Law Firm PA, New York, NY; Philip Howard Gordon, LEAD ATTORNEY, Bruce S Bistline, GORDON LAW OFFICES, Boise, ID.

For Daniel J. O'Hearn, Sr., Plaintiff: B Newal Squyres, LEAD ATTORNEY, HOLLAND & HART, Boise, ID; Jennifer Sarnelli, Joseph J. DePalma, Katrina Carroll, LEAD ATTORNEYS, PRO HAC VICE, Lite DePalma Greenberg & Rivas, LLC, Newark, NJ.

For Paul Berger, Plaintiff: Bruce S Bistline, Philip Howard Gordon, LEAD ATTORNEYS, GORDON LAW OFFICES, Boise, ID.

For Atlas Mining Company, Defendant: Thomas A. Banducci, LEAD ATTORNEY, BANDUCCI WOODARD SCHWARTZMAN, PLLC, Boise, ID.

For William T Jacobson, Defendant: Angelo J Calfo, Matthew A Carvalho, LEAD ATTORNEYS, PRO HAC VICE, Yarmuth Wilsdon Calfo PLLC, Seattle, WA; Bryan A Nickels, Kevin J Scanlan, LEAD ATTORNEYS, HALL FARLEY OBERRECHT and BLANTON, Boise, ID.

For Robert Dumont, Defendant: Nathan M Longenecker, LEAD ATTORNEY, TEMPKIN WIELGA HARDT & LONGENECKER LLP, Denver, CO; Stephen R Thomas, LEAD ATTORNEY, MOFFATT THOMAS BARRETT ROCK & FIELDS, Boise, ID.

**JUDGES:** Honorable Mikel H. Williams, Chief United States Magistrate Judge.

**OPINION BY:** Mikel H. Williams

**OPINION**

### MEMORANDUM DECISION AND **[\*2]** ORDER

Currently pending before the Court are motions filed by four different investors/investor groups to consolidate three pending lawsuits, be appointed lead plaintiff of the class action, and for approval of lead plaintiff's selection of counsel. Two of these motions, one filed by a group known as the Kipphut Movants (Docket No. 13) and the other by Rudy Rodriguez (Docket No. 15) have been withdrawn. *See* Docket No. 16 and Docket No. 45. Accordingly, those motions are MOOT. Still to be addressed are the motions of the O'Hern Group (Docket No. 12) and the Atlas Investors (Docket No. 17) to be appointed as lead plaintiff.

On January 22, 2008, Judge Lodge entered an order (Docket No. 29) consolidating the three lawsuits, *Benson v. Atlas Mining Co.,* Case No. 07-428-N-EJL, *Berger v. Atlas Mining Co.,* Case No. 07-449-N-MHW, and *O'Hern v. Atlas Mining Co.,* Case No. 07-503-N-LMB, into a lead case to be captioned *In re Atlas Mining Securities Litigation,* Case No. CV 07-428-N-EJL.

### I.

### Factual Background

Atlas Mining Company ("Atlas Mining") is a natural resources company based in Osborn, Idaho, that engages in the acquisition, exploration, and development of its mineral, timber and resource properties **[\*3]** in Idaho and

Utah. Atlas Mining develops the Dragon Mine in Juab County, Utah which is principally exploited for halloysite clay. The company also provides contract mining services and specialized civil construction services for mine operators, exploration companies, and construction and natural resource industries. Atlas Mining owns approximately 900 acres of fee-simple property and patented mining claims and 260 acres of mineral rights and unpatented claims located in the Coeur d'Alene mining district in Shoshone County, Idaho.

This litigation against Atlas Mining and certain Atlas Mining officers stems from Atlas Mining's allegedly improper accounting manipulations of reported earnings. On October 9, 2007, before market open, the company revealed that its prior financial statements for the fiscal years ended December 31, 2004, 2005 and 2006, along with the company's quarterly reports issued for March 31, June 30 and September 30, for the years 2005, 2006 and 2007 were materially false, misleading and had to be restated. The company admitted the restatements were necessary because Atlas Mining had inflated its revenues and under-reported net losses and long-term liabilities by improperly [*4] recognizing as revenues *future* deliveries of halloysite clay from Atlas Mining's Dragon Mine that were never delivered. Atlas Mining also announced that its previously reported net losses for the quarter and fiscal year ended 2004 were materially misstated with net losses being $ 1,196,274, instead of the reported net losses $ 946,274.

These disclosure caused the company's stock prices to fall. On October 8, 2007, the company's stock closed trading at $ 1.64 per share with 52,700 shares trading that day. On October 9, 2007, the day of the press release, the company's stock opened the day trading at $ 1.06 and closed the day at $ .80 a share, or down over 51% from the previous days' close, on over 6,418,299 shares traded.

## II.

### Procedural Background

The first lawsuit commenced in this jurisdiction on October 11, 2007 was *Benson v. Atlas Mining Co., et al.,* Case No. CV 07-428-N-EJL. [1] Pursuant to *15 U.S.C. § 78u-4(a)(3)(A)*, on October 12, 2007, the first notice that a class action had been initiated against defendants was published over a widely circulated national business-oriented wire service, *Market Wire,* advising members of the proposed class of their right to move the

Court to serve [*5] as lead plaintiff within 60 days. *Declaration of Joseph J. DePalma, "DePalma Dec.,"* Ex. B (Docket No. 14-3).

> 1    A second lawsuit was filed on October 19, 2007, *Berger v. Atlas Mining Co., et al.,* Case No. 07-449-N-MHW. A third lawsuit was filed on November 26, 2007, *O'Hern v. Atlas Mining Co., et al.,* Case No. 07-503-N-LMB.

On December 11, 2007, several motions to serve as lead plaintiff were filed in this class action lawsuit. First, at 4:43 p.m. MST, James O'Hern and John O'Hern (the "O'Hern Group") filed a motion seeking appointment as lead plaintiff. (Docket No. 12). The O'Hern Group had selected the law firms of Lite DePalma Greenberg & Rivas, LLC ("Lite DePalma") as lead counsel and Holland & Hart as liaison counsel. Next, at 4:50 p.m. MST, the Kipphut Movants [2] requested that they be appointed lead plaintiffs. (Docket No. 13). The Kipphut Movants had selected the law firms of Federman & Sherwood as lead counsel and Gordon Law Offices as liaison counsel. The next filing for lead plaintiff status was made by Rudy J. Rodriguez at 5:05 p.m. MST. (Docket No. 15). Mr. Rodriguez selected the law firms of Kahn Gauthier Swick, LLC ("KGS") and Brower Piven as co-lead counsel and Cosho Humphrey [*6] as liaison counsel. Subsequently, at 8:47 p.m. MST, the Kipphut Movants withdrew their motion for lead plaintiff status, noting their motion had been filed prematurely and inadvertently. (Docket No. 16). Then, a group calling themselves the "Atlas Investors" filed a motion to be appointed lead plaintiff at 8:53 p.m. MST. (Docket No. 17). The Atlas Investors consist of Frank and Margaret Cardy, Laurence Wang, Jacob Shank, Howard Nair, Robert B. Stonesifer, and Michael Kipphut. [3] The Atlas Investors seek to have the Rosen Law Firm appointed as lead counsel and Gordon Law Offices appointed as liaison counsel. On the day of the hearing in this matter, March 12, 2008, Mr. Rodriguez withdrew his motion to be appointed lead plaintiff. (Docket No. 45).

> 2    The Kipphut Movants consisted of Michael B. Kipphut, Anna D. Kipphut, and Robert B. Stonesifer.
> 3    These last two members of the Atlas Investors group were also members of the Kipphut Movants group.

### III.

2008 U.S. Dist. LEXIS 24201, *6

## Motions to Appoint Lead Plaintiffs and Approve Selection of Counsel

The Private Securities Litigation Reform Act ("PSLRA") sets forth a procedure for the selection of a lead plaintiff to oversee securities class actions brought pursuant to the Federal **[\*7]** Rules of Civil Procedure. *15 U.S.C. § 78u-4(a)*.

First, the plaintiff who files the initial action must publish notice to the class informing class members of their right to file a motion for appointment as lead plaintiff. *15 U.S.C. § 78u-4(a)(3)(A)(I)*. Within 60 days after publication of the notice, any member of the proposed class may move the court to serve as lead plaintiff of the purported class. *15 U.S.C. § 78u-4(a)(3)(A)(i)(II)*.

Next, the PSLRA provides that within 90 days after publication of notice, "the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints" and shall appoint as lead plaintiff the member or members that the court determines to be "most capable of adequately representing the interests of class members..." *15 U.S.C. § 78u-4(a)(3)(B)(i)*.

The PSLRA also provides a rebuttable presumption that the most adequate plaintiff is the person or group of persons that:

> (aa) has either filed the complaint or made a motion in response to a notice...
>
> (bb) in the determination of the court, has the largest financial interest in the relief **[\*8]** sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)*. This presumption can be rebutted only upon proof by a member of the purported plaintiff class that the presumptive plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)*.

The Ninth Circuit has recognized that a district court must follow a three-step process to determine the lead plaintiff in these actions. *In re Cavanaugh, 306 F.3d 726, 729 (9th Cir. 2002)*. First, the court must determine whether the procedural requirements are satisfied. *Id.* The procedural requirements demand that a motion for appointment as lead plaintiff be filed within 60 days of the published notice of the class action. *15 U.S.C. § 78u-4(a)(3)(A)*. Each prospective plaintiff must also provide a sworn certification that he or she has read the complaint, did not purchase the security at the direction of counsel or in order to participate in any private action and is willing to serve as a representative **[\*9]** party. *Id. § 78u-4(a)(2)(A)*. Second, the court must determine who has the largest financial interest by comparing the financial stakes of the parties. *In re Cavanaugh, 306 F.3d. at 729-30*. Once the individual or group of individuals with the largest financial interest is identified, the court must "focus its attention on *that* plaintiff" and determine whether the Rule 23 requirements are met. *Id. at 730* (emphasis in original). If the person or group with the largest financial interest meets Rule 23's requirements, they become the presumptive lead plaintiff. *Id.* The last step of the process is to give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's representations that it satisfies the requirements of *Rule 23. Id.*

### A. Procedural Requirements

Both the O'Hern Group and the Atlas Investors have complied with the procedural requirements. *See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa)*. The motions for appointment as lead plaintiff were both filed on December 11, 2007, within 60 days of the published notice. Additionally, all the individual members of the groups have filed certifications along with their motions. *See DePalma Dec.,* Ex. A; *Declaration of Philip Gordon, "Gordon* **[\*10]** *Dec.,"* Ex. 2 (Docket No. 17-3).

### B. Largest Financial Interest

PSLRA's requirement that the presumptive lead plaintiff have the "largest financial interest in the relief sought by the class" means the district court must compare the financial stakes of the various plaintiffs and determine which has the most to gain from the lawsuit. *In re Cavanaugh, 306 F.3d 726, 730 (9th Cir. 2002)*.

The O'Hern Group, consisting of brothers James and John O'Hern, claim aggregate losses of $ 92,589.75. [4]

2008 U.S. Dist. LEXIS 24201, *10

*DePalma Dec.,* Ex. C. The Atlas Investors [5] claim aggregate losses of $ 181,469.20. *Gordon Dec.,* Ex. 3.

> 4   James O'Hern claims losses of $ 78,202.99; John O'Hern claims losses of $ 14,386.76. James O'Hern has the largest individual amount of losses.
>
> 5   As noted earlier, two members of the "Atlas Investors" group, Robert B. Stonesifer and Michael Kipphut, were previously part of the now-withdrawn "Kipphut Movants" group. The Kipphut Movants claimed aggregate losses of $ 54,386.70.

The deciding question for the determination of who will serve as lead plaintiff is whether a group of unrelated investors [6] are able to aggregate their losses so that they have the largest financial interest in the litigation.

> 6   The members **[*11]** of the Atlas Investors group claim the following losses: Frank and Margaret Cardy, $ 68,510.00; Laurence Wang, $ 35,900.00; Jacob Shank, $ 11,450.00; Howard Nair, $ 11,368.00; Michael Kipphut, $ 26,594.20; and Robert Stonesifer, $ 26,647.00. *See Gordon Dec.,* Ex. 3.

The PSLRA expressly states the presumptive lead plaintiff may be a "person or group of persons." *See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).* What it does not state is whether individuals, particularly unrelated individuals, may aggregate their losses as a group for the purpose of becoming the lead plaintiff. *See In re Cavanaugh, 306 F.3d 726, 731 n.8 (9th Cir. 2002)* (noting that although the statute states a "group of persons" can serve as a lead plaintiff, the court would not be determining in that case whether a group could aggregate losses to satisfy the "largest financial interest" requirement).

The O'Hern Group contends that the only reason for the Atlas Investors existence as a "group" is to serve as a "vehicle for counsel to artificially increase the amount of investor losses." *O'Hern Group's Response Memorandum,* p. 5 (Docket No. 23). It is also pointed out that two members of the Atlas Investors group were members of another **[*12]** group, represented by different counsel, [7] just hours before the filing of the Atlas Investors' motion. Lastly, the O'Hern Group argues that permitting groups like the Atlas Investors to aggregate losses of unrelated individuals allows lawyers to direct litigation and is problematic when there is no

established mechanism for making lead plaintiff decisions.

> 7   The Kipphut Movants' lead counsel was Federman & Sherwood and liaison counsel was Gordon Law Offices. (Docket No. 16). Federman and Sherwood is now listed as "additional counsel" for the Atlas Investors group.

The Atlas Investors group maintains that a group such as itself is advantageous because it is far less likely that any potential defenses would successfully rebut a finding of typicality. It also argues that the class is better represented and stronger when the lead plaintiff is a group. The group also cites to several cases that have explicitly rejected the need for pre-litigation relationships and have appointed groups of unrelated investors as lead plaintiffs. *See Atlas Investors' Reply Memorandum,* p. 4 (Docket No. 30).

Some courts will not aggregate the losses of a group of unrelated persons so that group may serve as lead **[*13]** plaintiff. These courts observe that one of the principal purposes of the PSLRA was to "prevent lawyer-driven litigation and to allow for institutional plaintiffs with big financial stakes to serve as lead plaintiff and control the litigation." *Ruland v. InfoSonics Corp.,* 2006 WL 3746716, *3 (S.D. Cal. Nov. 7, 2006). See also In re Razorfish, Inc. Sec. Litig., 143 F. Supp. 2d 304 (S.D.N.Y. 2001).* Interpreting the word "group" to include an unrelated group of individuals does not further these objectives. *Ruland v. InfoSonics Corp.,* 2006 WL 3746716, *3 (S.D. Cal. Nov. 7, 2006). See also Sakhrani v. Brightpoint, Inc., 78 F. Supp. 2d 845, 853 (S.D. Ind. 1999)* (finding it was not an accurate interpretation of PSLRA to select a group of investors "who have the largest aggregate losses but who have nothing in common with one another beyond their investment" as lead plaintiff); *In re E.Spire Commc'ns, Inc. Sec. Litig., 231 F.R.D. 207, 213 (D. Md. 2000)* (a "group of persons" under PSLRA "should consist of more than a mere assemblage of unrelated persons who share nothing other than the fact that they suffered losses and entered into retainer agreements with the same attorneys"); *Aronson v. McKesson HBOC, Inc., 79 F. Supp. 2d 1146, 1153-54 (N.D. Cal. 1999)* **[*14]** (adopting a narrow definition of "group" to mean individuals who had a meaningful relationship preceding the litigation and who are united by more than the mere happenstance of having bought the same securities).

Other courts have allowed unrelated individuals to form a group and aggregate their losses. *In re Universal Access, Inc. Sec. Litig.* took a plain meaning approach to interpreting the statute. *209 F.R.D. 379 (E.D. Tex. 2002).* Noting that the PSLRA expressly stated "person or group of persons," that court appointed a group as lead plaintiff because it was appropriate under the statute and "sometimes favored in light of the diversity of experience and interests of group members." *Id. at 384.* [8] *See also In re Advanced Tissue Sci. Sec. Litig., 184 F.R.D. 346 (S.D. Cal. 1998)* (appointing "sub-group" of six unrelated individuals as lead plaintiff out of a group consisting of 250 members). To combat the concern that a group of unrelated individuals will not be able to manage the litigation effectively, some courts have taken a case-by-case approach and allowed a group to serve as lead plaintiff only upon a showing of how the group can effectively manage the litigation. *See In re Versata, Inc. Sec. Litig., 2001 U.S. Dist. LEXIS 24270, 2001 WL 34012374 (N.D. Cal. Aug. 20, 2001)* **[*15]** (noting group had shown it had a regular meeting calendar, a procedure to resolve disagreements, etc.); *Local 144 Nursing Home Pension Fund v. Honeywell Int'l, Inc., 2000 U.S. Dist. LEXIS 16712, 2000 WL 33173017 (D.N.J. Nov. 16, 2000)* (same). *See also Schonfield v. Dendreon Corp., 2007 U.S. Dist. LEXIS 76816, 2007 WL 2916533, *2 (W.D. Wash. Oct. 4, 2007).*

> 8    Notably, in that case, the group that was appointed as lead plaintiff included an individual whose losses alone were larger than the aggregated losses of the other group competing for lead plaintiff status. *Id.*

It is clear that groups may be appointed as lead plaintiff under PSLRA. What remains undecided by the Ninth Circuit is whether a group of unrelated individual can aggregate their losses for the purposes of determining who has the largest financial interest. The Court finds the former cases cited above to be more persuasive will not aggregate the losses of a group that does not have a pre-existing relationship. The PSLRA was enacted to combat a race to the courthouse by plaintiffs' lawyers in class action lawsuits. *See In re E.Spire Commc'ns, Inc. Sec. Litig., 231 F.R.D. 207, 210 (D. Md. 2000)* (citing S.Rep. No. 104-98 (1995) reprinted in 1996 U.S.C.C.A.N. at 679). The Atlas Investors **[*16]** appear to be purely lawyer-driven. Two of the members were members of another group, with different counsel, four hours prior to the filing of the Atlas Investors' motion.

There is no connection between the individuals in this group. When a group does not have a pre-existing relationship, appointing that group as lead plaintiff would not best serve the class. It would also defeat the PSLRA's purpose to prevent lawyer-driven litigation. The Court finds that the O'Hern Group [9] has the largest financial interest in the pending litigation and has a pre-existing familial relationship as brothers.

> 9    At the hearing held March 11, 2008, the Atlas Investors claimed that James O'Hern had purchased 300,000 shares of stock pre-class period and therefore he made a profit. Courts typically apply the "Olsen-Lax" factors to determine who has the largest financial interest. *See Richardson v. TVIA, Inc. 2007 U.S. Dist. LEXIS 28406, 2007 WL 1129344 (N.D. Cal. April 16, 2007).* These factors consider the number of shares purchased *during the class period,* the number of net shares purchased *during the class period,* the total net funds purchased *during the class period* and the approximate losses suffered. *2007 U.S. Dist. LEXIS 28406, [WL] at *3.* Any pre-class period **[*17]** purchase of shares by James O'Hern is not relevant to the losses he claims he suffered from the decreased value in the shares purchased *during* the class period.

## C. Rule 23 Requirements

*Rule 23* requires that the Court find that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

The requirements of "typicality" and "adequacy" of representation are the key factors in determining the appropriate lead plaintiff under the PSLRA. *See In re Cavanaugh, 306 F.3d 726, 730 (9th Cir. 2002).*

The "typicality requirement" is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Fed. R. Civ. P. 23(a)(3)*. The test of typicality is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).* **[*18]** In cases arising under the PSLRA, courts have found the typicality requirement satisfied when the lead plaintiff's alleged injuries arise from "the same course of conduct complained of by the other plaintiffs and his causes of actions are founded on similar legal theories." *Schonfield v. Dendreon Corp., 2007 U.S. Dist. LEXIS 76816, 2007 WL 2916533, *4 (W.D. Wash. Oct. 4, 2007).*

The O'Hern Group satisfies the typicality requirement because they purchased Atlas Mining stock during the class period in reliance on Defendants' misrepresentations and subsequently suffered damages. The group's losses arise from the same course of conduct complained of by the other plaintiffs. Additionally, there is no evidence that the O'Hern Group is subject to any unique defenses.

The adequacy requirement is satisfied "if there are no conflicts between the representative and class interests and the representative's attorneys are qualified, experienced, and generally able to conduct the litigation." *Richardson v. TVIA, Inc., 2007 U.S. Dist. LEXIS 28406, 2007 WL 1129344, *4 (N.D. Cal. 2007).* The O'Hern Group's interests appear aligned with those of the other class members and there is no evidence of conflict between the representative and class interests. In reviewing **[*19]** the record, it appears the O'Hern Group has retained qualified and experienced attorneys. *See Gordon Dec.,* Exs. 4-5. Because the O'Hern Group satisfies the requirements of *15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)*, it is the presumptive lead plaintiff.

### D. Rebuttal of Lead Plaintiff Presumption

The PSLRA provides that the lead plaintiff presumption may be rebutted upon proof that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).*

The Atlas Investors attempt to rebut this presumption by arguing that the counsel chosen by the O'Hern Group, Lite DePalma, filed a "copy-cat" lawsuit with named plaintiff Daniel J. O'Hern, Sr. ("O'Hern Sr.") The Atlas Investors claim that O'Hern Sr. had no standing to bring the class action and has not suffered any losses. They claim the filing of this lawsuit by Lite DePalma is tantamount to a *Rule 11* violation. Secondly, the Atlas Investors believe that James O'Hern's listed trades in his certification and loss chart are incomplete.

In response to the first argument made by **[*20]** the Atlas Investors, the O'Hern group submits that the standing of O'Hern Sr. is irrelevant because he is not moving for lead plaintiff status. [10] As to the second argument, the O'Hern Group submits its belief that the class period ended on October 8, 2007, because the fraud was revealed prior to the opening of the market on October 9, 2007. They maintain there is no requirement to reveal pre- and post-class period transactions.

> 10    The O'Hern Group also submits that it believes the class period began in 2004 rather than on March 31, 2005 and if that is the case, O'Hern Sr. would have standing.

The Atlas Investors attack of the presumption favoring the O'Hern Group fails. The standing of O'Hern Sr. is not before the Court because he is not a member of the O'Hern Group. Secondly, the Court agrees, as stated above in footnote 9, that any pre- or post-class period transactions would be irrelevant in calculating losses. Lastly, the Atlas Investors have not offered proof that the O'Hern Group cannot "fairly and adequately protect the interests of the class" or "is subject to unique defenses." *See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).*

### E. Selection of Counsel

The PSLRA provides that the most adequate **[*21]** plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." *15 U.S.C. § 78u-4(a)(3)(B)(v).* The O'Hern Group has requested that the Court approve their selection of Lite DePalma as lead counsel and Holland & Hart as liaison counsel.

The O'Hern Group submits that Lite DePalma and Holland & Hart are very qualified litigators with extensive experience in prosecuting complex securities actions. *See DePalma Dec.,* Exs. D and E. Having reviewed both firm's resumes, the Court finds that Lite

DePalma and Holland & Hart are both sufficiently qualified and experienced to serve, respectively, as lead and liaison counsel. The Court will approve the lead plaintiffs' selection of counsel.

**ORDER**

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1) Motion of the O'Hern Group to be Appointed Lead Plaintiff, and for Approval of Lead Plaintiff's Selection of Lead Counsel and Liaison Counsel (Docket No. 12), be **GRANTED;**

2) The Kipphut Movants' Motion for Appointment of Lead Plaintiffs and for Approval of Choice of Lead and Liaison Counsel for the Class (Docket No. 13), be found **MOOT;**

3) Motion of Rudy Rodriguez **[*22]** for Appointment of Lead Plaintiff and Approval of Selection of Lead Plaintiff's Choice of Lead Counsel and Liaison Counsel (Docket No. 15), be found **MOOT;**

4) Motion of Atlas Investors to Appoint Lead Plaintiffs and Approve Lead Plaintiffs' Selection of Counsel (Docket No. 17), be **DENIED.**

DATED: March 25, 2008

/s/ Mikel H. Williams

Honorable Mikel H. Williams

Chief United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/20/07

In re OPTIONABLE SECURITIES LITIGATION

This Paper Applies to:                 All Cases                                    07 Civ. 3753 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER

LEWIS A. KAPLAN, *District Judge.*

These are consolidated class actions alleging, generally, securities violations in connection with trading in the securities of Optionable, Inc. Now before the Court are competing motions for appointment of a lead plaintiff or plaintiffs and for approval of lead plaintiff's choice of counsel.

Under the Private Securities Litigation Reform Act ("PSLRA"), the Court is obliged to appoint as Lead Plaintiff the movant it determines to be the most capable of representing the interests of the class members. 15 U.S.C. §§ 78u-4(a)(3)(B)(I), 77z-1(a)(3)(B)(I). In making that determination, the moving plaintiff with the largest financial interest in the relief sought by the class is entitled to a presumption in its favor.

In this case, KLD Investment Management, Inc. ("KLD") claims a loss of over $3.7 million, which is more than three times greater than the loss claimed by any other movant. It therefore is entitled to the presumption unless those opposing its appointment in some material way have undermined that claim.

The principal argument against KLD is that KLD is a money manager that never owned any shares. While it appears to be the case that KLD is a money manager, its papers represent

that it had sole discretion to invest on behalf of its clients, that it purchased all of the shares that gave rise to the claimed loss for individual clients, and that the shares then were allocated to the individual client accounts. Moreover, it maintains that it "has the sole discretion and attorney-in-fact authority to make investments and related investment decisions for its clients and to bring litigation on their behalf to recover for investment losses." KLD Certification ¶ 7.

KLD's allegations, if accurate, would be sufficient to establish that it acted as a single person and thus that the aggregation of the purchases ultimately allocated among its advisees would be appropriate. *See Smith v. Suprema Specialties, Inc.*, 206 F. Supp.2d 627, 634 (D. N.J. 2002) (citing cases). Reliance on its certification, however, might have been inadequate. *Weisz v. Calpine Corp.*, 2002 WL 32818827, at *6 (N.D. Cal. Aug. 19, 2002). Accordingly, the Court directed KLD to submit evidence establishing that (a) it had unconstrained investment discretion over the accounts to which the Optionable shares were allocated at the time the shares were purchased and allocated, and (b) it is the attorney-in-fact of each account owner for the purpose of bringing and maintaining this action. It has done so. Accordingly, it is entitled to the presumption that it is the most capable of representing the interests of the putative class members. None of the competing candidates has rebutted this presumption.

The Court is satisfied also that KLD satisfies the requirements of Rule 23. The PSLRA inquiry in this regard focuses principally on the typicality and adequacy requirements. *See, e.g., Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Labranche & Co.*, 229 F.R.D. 395, 411 (S.D.N.Y. 2004).

"Typicality exists if claims 'arise from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Id.* at 412. The

3

suggestion that KLD's decisions were influenced by inside information is conclusory and unsubstantiated. Hence, its claims appear to be typical of those of the class in general.

In order to satisfy the adequacy requirement, "(1) there should be no conflict between the interests of the class and the named plaintiff nor should there be collusion among the litigants; and (2) the parties' attorney must be qualified, experienced, and generally able to conduct the proposed litigation." *Id.* There is no conflict here, and KLD's counsel appear to be able to handle this case appropriately.

Accordingly, the motion of KLD Investment Management, LLC to serve as Lead Plaintiff and to approve its choice of counsel [docket item 38] is granted. The competing motions by others [docket items 23, 26, 32, 35 and 41] all are denied.

SO ORDERED.

Dated:        November 20, 2007

_____
Lewis A. Kaplan
United States District Judge