UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x
In re SUNOPTA INC. SECURITIES   :
LITIGATION   :
———————————————————————— :
  :
This Document Relates To:   :
  :
    ALL ACTIONS.   :
———————————————————————— x

Master File No. 1:08-cv-00933-PAC

CLASS ACTION

DECLARATION OF SAMUEL H.
RUDMAN IN SUPPORT OF LEAD
PLAINTIFFS' UNOPPOSED MOTION FOR
(A) FINAL APPROVAL OF CLASS
ACTION SETTLEMENT AND PLAN OF
ALLOCATION OF SETTLEMENT
PROCEEDS; AND (B) AN AWARD OF
ATTORNEYS' FEES AND EXPENSES

# TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ................................................................ 2

II.    SUMMARY OF LEAD PLAINTIFFS' ALLEGATIONS ................................. 3

III.   LEAD PLAINTIFFS' PROSECUTION OF THE CASE ................................. 5

      A.    The Commencement of the Litigation, Consolidation of the Cases and Appointment of Lead Plaintiffs and Lead Counsel ................................. 5

      B.    The CAC – the Southern District of New York Action ......................... 6

      C.    The Canadian Action ................................................................ 6

      D.    Experts .................................................................................... 7

      E.    Settlement Negotiations ................................................................ 7

      F.    Corporate Governance Enhancements ........................................... 10

      G.    Preliminary Approval of Settlement and Mailing and Publication of Notice of Settlement ................................................................ 11

IV.   FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT ........... 13

      A.    The Settlement Was Fairly and Aggressively Negotiated by Counsel ........ 13

      B.    The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Potential Risks in Litigation ...................... 13

            1.    The Risk of Establishing Liability ........................................... 15

            2.    The Risks of Establishing Loss Causation and Damages ............... 15

      C.    The Stage of the Proceedings and the Amount of Discovery Completed ........ 16

V.     PLAN OF ALLOCATION ................................................................ 17

VI.   FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD ................................................................ 18

      A.    Extent of Litigation ................................................................ 19

      B.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases ............... 20

514139_1

     C.     Standing and Expertise of Lead Counsel ................................................................23

     D.     Standing and Caliber of Opposition Counsel ......................................................23

VII.    CONCLUSION ................................................................................................................23

514139_1

SAMUEL H. RUDMAN declares:

1. I am member of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"),[1] the Court-appointed lead counsel for the U.S. Class in this action. Based upon my active participation in the prosecution and settlement of this action, I have personal knowledge of the matters set forth herein.

2. I submit this declaration in support of lead plaintiffs Western Washington Laborers-Employers Pension Trust and Operating Engineers Construction Industry and Miscellaneous Pension Fund's ("Lead Plaintiffs") application, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for: (a) final approval of settlement of this action; (b) final approval of the Plan of Allocation of settlement proceeds; and (c) an award of attorneys' fees and expenses.

3. The Stipulation and Settlement Agreement dated as of September 23, 2009 ("Stipulation") provides for the payment of $11,250,000 in cash and significant corporate governance improvements to SunOpta Inc. ("SunOpta" or the "Company"). The settlement resolves all claims asserted by Lead Plaintiffs and the U.S. Class in this action against defendants SunOpta, Organic Ingredients Inc., Cleugh's Frozen Foods, Inc. ("Cleugh's Frozen Foods"), and Pacific Fruit Processors, Inc. (collectively, the "Corporate Defendants"), and Steven R. Bromley, John H. Dietrich, Stephen R. Bronfman ("Bronfman"), Jeremy Kendall, Christopher Snowden, Joseph Riz, and Sergio Varela ("Varela") (collectively, the "Individual Defendants" and together with the Corporate Defendants, "Defendants"), as well as in parallel litigation pending in the Ontario Superior Court of Justice in Canada (the "Canadian Action").

---

[1] On March 24, 2010, Lead Plaintiffs filed a Notice of Firm Name Change stating that Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia") had changed its name to Robbins Geller Rudman & Dowd LLP.

- 1 -

4.     This declaration sets forth the nature of the claims asserted, the principal proceedings to date, the legal services provided by Lead Counsel, the settlement negotiations, and also demonstrates why the settlement and Plan of Allocation are fair and in the best interests of the U.S. Class, and why the application for attorneys' fees and expenses is reasonable and should be approved by the Court.

## I.     PRELIMINARY STATEMENT

5.     This case was carefully investigated and vigorously litigated since its commencement. Lead Counsel thoroughly reviewed and analyzed all publicly available information regarding SunOpta, including, but not limited to, its Securities and Exchange Commission ("SEC") filings, financial statements, press releases, and a wealth of analysts' reports and notes rendered by securities firms. Lead Counsel also interviewed several former employees of the Company in order to collect information necessary to plead in conformance with the strict pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Moreover, in order to confirm the fairness and reasonableness of the settlement, Lead Counsel obtained and reviewed evidence from Defendants, including tens of thousands of pages of documents, as well as an interview with Eric Davis ("Davis"), the present Chief Financial Officer ("CFO") of SunOpta.

6.     Lead Counsel also consulted with experts in accounting and damages, thoroughly researched the law pertinent to the claims and defenses asserted, and engaged in ongoing communications with the Court-appointed Lead Plaintiffs.

7.     During settlement negotiations, Lead Counsel made it very clear that, while Lead Plaintiffs were prepared to fairly assess the strengths and weaknesses of this case, Lead Plaintiffs would continue to litigate rather than settle for less than fair value.

8.     In sum, this settlement is the product of extensive investigation, and aggressive litigation and negotiation, and takes into account the risks specific to this case. It was negotiated on both sides by experienced counsel with a firm understanding of the strengths and weaknesses of their clients' respective claims and defenses. The settlement confers an immediate and substantial benefit on the U.S. Class and eliminates the risk of continued litigation. Lead Counsel respectfully submit that under these circumstances the settlement is in the best interest of the U.S. Class and should be approved as fair, reasonable, and adequate. The Court should also approve the Plan of Allocation of settlement proceeds and award attorneys' fees in the amount of 25% of 70% of the Settlement Fund, or 17.5%, plus expenses of $106,368.48 for Lead Counsel's efforts in creating this substantial benefit on behalf of the U.S. Class.[2]

## II.     SUMMARY OF LEAD PLAINTIFFS' ALLEGATIONS

9.     This action was brought by Lead Plaintiffs, on behalf of themselves and all persons who purchased or otherwise acquired SunOpta securities between February 23, 2007 and January 27, 2008 (the "Class Period"). Lead Plaintiff alleged violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, in addition to violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

10.     Defendant SunOpta specializes in the sourcing, processing, and distribution of natural and organic food products primarily in Canada, the United States, and Mexico.

---

[2]     Plaintiffs' damage consultant calculated the allocation of estimated damages between the two actions as approximately 70% to the U.S. Action, and 30% to the Canadian Action. Therefore, counsel in the two actions have agreed to seek a similar allocation on attorneys' fees.

11.     As alleged in the Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws (the "CAC"), throughout the Class Period, SunOpta's business was suffering from numerous undisclosed adverse factors, which were negatively impacting its business.

12.     Specifically, Lead Plaintiffs alleged that: (i) in or around March 2007, defendant Varela, President, SunOpta Fruit Group, replaced the old inventory system with a new inventory system, the Oracle system.  Shortly thereafter, the Company began experiencing problems due to several issues, including that the new system was never integrated and reconciled with the old system, the conversion occurred without an adequate IT team in place, and system users received little to no training on the new Oracle system; (ii) SunOpta was experiencing problems with inventory-related controls at one of the Company's operating business segments, the SunOpta Fruit Group ("Fruit Group"); (iii) Cleugh's Frozen Foods, a subsidiary of SunOpta, was experiencing problems with accounts receivable due to erroneous sales orders from incorrect billings, shipments, and invoices; and (iv) during the Class Period, SunOpta's earnings during all quarters had been manufactured to meet or exceed Wall Street estimates through various improper accounting practices.  The CAC further alleged that Company's Class Period financial statements were materially false and misleading and presented in violation of Generally Accepted Accounting Principles ("GAAP") because the Company improperly overstated its revenues.

13.     As a result of Defendants' alleged misrepresentations, during the Class Period, the price of SunOpta stock reached a Class Period high of $15.18 per share on October 9, 2007.

14.     Additionally, Lead Plaintiffs alleged that the Company negligently prepared a Registration Statement and Prospectus in December 2007 in connection with the sale of SunOpta common shares by defendant Bronfman (the "Secondary Offering").  Specifically, the CAC alleged that the Registration Statement contained financial statements that were falsely represented to have

- 4 -

been in compliance with GAAP and SEC accounting rules and regulations, made untrue representations about the Company's disclosure and internal controls, and failed to disclose the true risks associated with investing in SunOpta.

15. On December 20, 2007, after selling more than 5.1 millions shares of SunOpta stock, the Company issued a press release announcing that defendant Bronfman resigned from his position as a member of its Board of Directors.

16. At the end of the Class Period, SunOpta issued a press release announcing that, as a result of the Company's deficient inventory-related controls and lack of internal controls over financial reporting, the Company's earnings during the Class Period had been overstated and it would not meet its earnings expectations for the four quarters in 2007. Specifically, Fruit Group's berry operations would be required to take a $9 to $11 million write-down as a result of inventory-related issues. In response to this announcement, the price of SunOpta stock dropped nearly 40%, falling to $6.05 per share, on extremely heavy trading volume.

## III. LEAD PLAINTIFFS' PROSECUTION OF THE CASE

### A. The Commencement of the Litigation, Consolidation of the Cases and Appointment of Lead Plaintiffs and Lead Counsel

17. On January 28, 2008, plaintiff Troy Arden Juliar filed a securities class action complaint in the United States District Court for the Southern District of New York (the "Complaint").

18. The Complaint alleged that Defendants issued false and misleading statements which failed to acknowledge the following adverse facts: (i) that the Company had materially overstated its financial results because SunOpta failed to timely record an impairment in the value of its berry inventory; (ii) that the Company lacked adequate internal controls and was therefore unable to ascertain its true financial condition; (iii) that defendant Bronfman, a member of the Company's

- 5 -

Board of Directors, sold more than 5 million shares of stock in the Secondary Offering through a Registration Statement issued by the Company that contained false and misleading statements regarding the Company's true financial condition; (iv) that the Individual Defendants and other SunOpta insiders took advantage of the artificial inflation caused by their material misstatements and sold over 51,000 shares of their personally-held SunOpta stock, generating proceeds of more than $650,0000; and (v) based on the foregoing, the Defendants lacked a reasonable basis for their positive statements concerning the Company's earnings, prospects, and financial results.

19.    On April 14, 2008, motions to consolidate the pending cases and for appointment of lead plaintiff were filed with the Court. On January 30, 2009, an order was signed by the Honorable Paul A. Crotty appointing Lead Plaintiffs as lead plaintiffs and appointing Coughlin Stoia (now known as Robbins Geller) as Lead Counsel.

B.    The CAC – the Southern District of New York Action

20.    On April 14, 2009, Lead Plaintiffs filed the CAC. The seventy-two page CAC detailed Lead Plaintiffs' allegations in one hundred and seventy-three paragraphs.

21.    The CAC greatly expanded the allegations of the Complaint by including confidential witness statements from individuals with first-hand knowledge of the allegations. As set forth in the CAC, these four confidential witnesses provided extensive detailed information to Lead Plaintiffs and their counsel concerning the undisclosed adverse problems at the Company.

C.    The Canadian Action

22.    Approximately three weeks after the first class action was filed in the United States against Defendants, on March 18, 2008, plaintiff John O'Neil commenced an action against defendants SunOpta, Steven R. Bromley, and John H. Dietrich before the Ontario Superior Court of Justice by issuance of the Statement of Claim (the "Canadian Action"). The Statement of Claim was

- 6 -

subsequently amended on August 28, 2008. A hearing on Mr. O'Neil's motion for final approval of the settlement of the Canadian Action is scheduled for May 3, 2010.

**D.    Experts**

23.    To help analyze and plead their claims, as well as to assess damages in connection with the mediation that led to the settlement in principle of this action, Lead Plaintiffs retained various experts, including forensic accountants and damages experts.

**E.    Settlement Negotiations**

24.    Due to the strength of Lead Plaintiffs' allegations, shortly after the filing of the CAC counsel for Defendants contacted Lead Counsel to discuss a possible resolution of this case through a mediation. The mediation, which was attended in person by counsel for Lead Plaintiffs, as well as counsel for the plaintiff in the Canadian Action, was held on July 8, 2009, before former California Superior Court Judge Daniel L. Weinstein. The mediation, which was at times contentious, was always conducted at arm's length and lasted one full day, from early in the morning until late in the evening.

25.    In connection with the mediation, Judge Weinstein recommended that the parties jointly retain an impartial damages expert to provide an objective assessment of what the recoverable damages were. The impartial damages expert provided the parties with a range for worldwide damages.

26.    By the end of the mediation, the parties had reached an agreement to settle this action and the Canadian Action for $11.25 million, as well as the adoption of numerous corporate governance enhancements, as detailed herein, pending further agreement on other terms and the completion of discovery confirming the fairness, adequacy, and reasonableness of the settlement.

- 7 -

27.     In this regard, Defendants provided extensive discovery to Lead Plaintiffs so that Lead Plaintiffs and their counsel (and counsel for plaintiff in the Canadian Action) could confirm the fairness and reasonableness of the settlement.  Through the review of the discovery provided by Defendants, Lead Counsel was in a position to properly evaluate the claims and confirm that the settlement is fair, reasonable, and adequate.  During the confirmatory discovery stage of the litigation, Lead Counsel reviewed 11,526 of documents (comprised of 587,215 pages) which supported Lead Plaintiffs' allegations.  Specifically, Lead Counsel reviewed internal emails and memos that stated that the Company began experiencing problems with its new Oracle inventory system implementation in early 2007, including system failures and technical issues.  Additionally, the Company was experiencing IT staffing issues and was suffering from a lack of proper training with the integration of the Oracle system.  Lead Counsel also reviewed numerous internal emails and memos indicating that the Company lacked proper internal controls to handle invoicing issues, as well as numerous third party invoices that included errors in costing, billing, packing, and shipping information.  Lead Counsel also reviewed various internal emails which stated that the Company lacked qualified accounting personnel, specifically within the Fruit Group.

28.     In addition to reviewing tens of thousands of pages of documents, Lead Counsel also interviewed Mr. Davis, SunOpta's present CFO (who joined the Company in March 2009, after the end of the Class Period), concerning the current financial condition of the Company, as well the Company's ability to fund a part of the settlement.

29.     At the mediation, Mr. Davis made a presentation to Lead Counsel, and responded to numerous probing questions from Lead Counsel's forensic accountant regarding SunOpta's current financial affairs.  Specifically, Mr. Davis explained that SunOpta's accounts receivables and inventories, as well as the Company's long-term assets, were subject to a first priority lien held by

- 8 -

the Company's lenders. Moreover, Mr. Davis represented that SunOpta faced significant near term debt repayment obligations. These debt obligations included a $45 million term loan facility and $65 million in existing financings, each of which was to come due in December 2009. Mr. Davis further explained that, as a result of the Company's violation of certain debt covenants, SunOpta would have to refinance approximately $110 million in debt before the end of 2009. Mr. Davis continued by stating that while he was hopeful that SunOpta could obtain such financing, the current liquidity crisis and reluctance of lenders to make loans in the current economic environment posed a significant challenge in meeting such an objective.

30. As a result of the CFO's presentation at the mediation, Lead Counsel took Mr. Davis' representations under advisement when considering the fairness and adequacy of the overall settlement of the Lead Plaintiffs' claims.

31. Thereafter, the parties negotiated the terms of the Stipulation and exhibits in support thereof. These negotiations were also conducted at arm's length.

32. In view of the discovery efforts of Lead Plaintiffs, the advice of their experts, and the discussions that occurred during the parties' settlement negotiations, Lead Counsel were able to identify the issues that were critical to the outcome of this case. Lead Counsel considered the risks of litigation, the likelihood of getting past summary judgment after expensive fact and expert discovery and, if successful, the risk, expense, and length of time to prosecute the litigation through trial and the inevitable subsequent appeals. Lead Counsel also considered the substantial (and immediate) monetary benefit provided by the settlement in light of the risk of taking the case to trial. Lead Plaintiffs participated in this assessment and were consulted with, and kept apprised, concerning the settlement negotiations.

514139_1

33.     Lead Counsel is actively engaged in complex federal civil litigation, particularly the litigation of securities class actions. We believe that our reputations as attorneys who are unafraid to zealously carry a meritorious case through the trial and appellate levels gave us a strong position in engaging in settlement negotiations with Defendants.

34.     After negotiations concerning the final terms of the parties' settlement, the parties executed the Stipulation and submitted it to the Court for preliminary approval.

35.     Lead Counsel respectfully submit that, under the circumstances, the settlement represents an excellent result for the U.S. Class. The settlement will provide U.S. Class members with a benefit without the risk of not obtaining any recovery if the litigation was to continue.

36.     The facts learned during confirmatory discovery, as well as the developing case law in this area of the law, showed that while the litigation was well-founded, Lead Plaintiffs would have had to overcome substantial hurdles had the litigation continued.

**F.      Corporate Governance Enhancements**

37.     Aside from monetary compensation for U.S. Class members, the Stipulation also includes various corporate governance enhancements aimed at ensuring that SunOpta's business practices, specifically the Company's internal controls over financial reporting, as well as the integration of new information technology systems, are vastly improved.

38.     Following the effective date of the Stipulation, SunOpta agreed to implement the following amendments to its Audit Committee Charter: (i) SunOpta will make explicit the practice of the Audit Committee that it shall have an understanding of the Company's internal controls over financial reporting; (ii) SunOpta will explicitly provide for oversight by the Audit Committee of timely rectification of internal control issues; (iii) SunOpta will explicitly include among the Audit Committee's responsibilities, reporting annually to the Board of Directors on internal controls; (iv)

- 10 -

SunOpta will provide for its CFO to review annually with the Audit Committee the Company's key accounting policies; (v) SunOpta will provide for quarterly reports to the Audit Committee on any concerns communicated by employees to the Company's existing Confidence Line (or successor program) concerning internal controls and financial reporting; (vi) SunOpta will require an annual review by the Audit Committee with the Company's CFO of the staffing and qualifications of the Company's finance organization; (vii) SunOpta will make explicit that the annual Internal Audit Plan shall include a review of the Company's internal controls over financial reports; and (viii) SunOpta will adopt an Information Technology Conversion Policy which would provide for continued operation of the legacy system until its Director of Information Technology has completed successful testing as to the reliability and efficacy of the system intended to replace the legacy system.

39.    These corporate governance enhancements provide a great benefit for long-term shareholders of SunOpta, which includes members of the U.S. Class.

### G.    Preliminary Approval of Settlement and Mailing and Publication of Notice of Settlement

40.    On February 2, 2010, the Court preliminarily approved the terms of the settlement and directed that Lead Counsel cause the mailing of the Notice of Pendency and Certification of Class Actions, Proposed Settlement and Settlement Approval/Fairness Hearings (the "Notice") and the Proof of Claim and Release form (the "Proof of Claim") to all potential U.S. Class members identifiable with reasonable effort (the "Notice Order").

41.    The Court's Notice Order also directed Lead Counsel to cause the Summary Notice of Pendency and Certification of Class Actions, Proposed Settlement and Settlement Approval/Fairness Hearings ("Summary Notice"), to be published in *Investor's Business Daily* and over the *Businesswire*.

- 11 -

42.     Submitted herewith is the Declaration of Carole K. Sylvester re A) Mailing of the Notice of Pendency and Certification of Class Actions, Proposed Settlement and Settlement Approval/Fairness Hearings and the Proof of Claim and Release Form, and B) Publication of the Summary Notice of Pendency and Certification of Class Actions, Proposed Settlement and Settlement Approval/Fairness Hearings ("Sylvester Declaration"), the Claims Administrator, which attests that Notices have been mailed to over 22,650 potential U.S. Class members. The Summary Notice was published on February 11, 2010, as directed by the Court, and the following documents were posted on the Claims Administrator's website: English and French language versions of the Notice, English and French language versions of the Proof of Claim, the Stipulation, and the orders of the Southern District of New York and the Ontario Superior Court of Justice regarding preliminary approval.

43.     The Notice informed U.S. Class members of the terms of the settlement, the Plan of Allocation of the settlement proceeds, and that Lead Counsel would apply for an award of attorneys' fees not to exceed 25% of 70% of the Gross Settlement Fund, and expenses not to exceed $150,000.00.

44.     The Notice also provided that any objections to the settlement, the Plan of Allocation of settlement proceeds or the application for attorneys' fees and expenses have to be filed by April 12, 2010. Although that time period has not yet expired, as of the date of this declaration, to my knowledge, no objections have been filed by any member of the U.S. Class to the settlement, the Plan of Allocation of settlement proceeds, or to the application for attorneys' fees and expenses. Pursuant to the schedule set by the Court, on February 2, 2010, we will respond to any objections received by the deadline for submission thereof.

514139_1

# IV. FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT

## A. The Settlement Was Fairly and Aggressively Negotiated by Counsel

45. As set forth above, the terms of the settlement were negotiated by the parties at arm's length through adversarial but good faith negotiations. The settlement was the product of numerous discussions occurring over several months between Lead Counsel, counsel in the Canadian Action, Defendants' counsel, and counsel for Defendants' insurer. Throughout the course of those negotiations, all parties were represented by counsel with extensive experience in securities litigation in general and securities class actions in particular. The settlement was the result of an adversarial process designed to produce a fair, reasonable, and adequate compromise.

46. Indeed, the following factors, which have been cited by the Second Circuit as the pertinent criteria for evaluating the fairness of a proposed settlement, counsel in favor of approval of the settlement: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *See Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). Each of these factors supports approval of the settlement.

## B. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Potential Risks in Litigation

47. An important factor considered in assessing the merits of class action settlements – whether serious questions of law and fact exist – supports the conclusion that the settlement is fair, reasonable, and adequate to the U.S. Class. As in every complex case of this kind, Lead Plaintiffs

- 13 -

and the U.S. Class faced obstacles to recovery, both with respect to liability and damages. While Lead Plaintiffs and Lead Counsel believe that the allegations in the CAC have substantial merit, Defendants have denied liability and assert that they possess absolute defenses to the claims alleged.

48.     During the course of this litigation, Lead Plaintiffs believed that they had developed significant evidence in support of their allegations. At the same time, however, they came to realize that equally significant hurdles existed such that prevailing on Defendants' motion to dismiss or in response to a motion for summary judgment or at trial could be difficult. Some of the major issues confronting the U.S. Class were the falsity of Defendants' Class Period statements, proving scienter, loss causation, and damages.

49.     The range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation were important factors in Lead Plaintiffs' decision to settle the action and weigh heavily in favor of the settlement. Class Members will receive $11.25 million in exchange for the release of all claims against Defendants – a significant result for the Class both in absolute terms and when viewed in light of the risks of litigation. The $11.25 million recovery represents a substantial percentage of the Class's maximum provable damages. Without exposing the Class to the risks of further litigation, Lead Plaintiffs have obtained a recovery representing a substantial portion of the Class's theoretical damages and a recovery which far exceeds the median settlement recovery in comparable securities cases.

50.     Moreover, assessing the merits of this class action settlement – whether serious questions of law and fact exist – support the conclusion that the settlement is fair, reasonable, and adequate to the U.S. Class. As in every complex case of this kind, Lead Plaintiffs and the U.S. Class faced obstacles to recovery, both with respect to liability and damages. While Lead Plaintiffs and

- 14 -

their counsel believe that their allegations have substantial merit, Defendants have denied liability and assert that they possess absolute defenses to the claims alleged.

### 1. The Risk of Establishing Liability

51.     Lead Plaintiffs recognized that they faced substantial risks if the action continued. Lead Plaintiffs and Lead Counsel heavily considered and analyzed potential risks to continued litigation of the action in determining the settlement's fairness, and in light of such risks, believe the proposed settlement is in the best interests of the U.S. Class.

52.     If the action was to proceed, Lead Plaintiffs faced hurdles with respect to, among other things, establishing scienter. Defendants have contended that none of them acted knowingly or intentionally with respect to the conduct alleged in the CAC. While Defendants acknowledge that certain errors were made, Defendants insist that they were minor, did not involve high-level executives, and were not knowingly violative of accounting or disclosures rules.

53.     After reviewing tens of thousands of documents, which included numerous internal emails and inter-company memos that demonstrate that Defendants knowingly or recklessly made false and misleading statements, as well as showing their motive and opportunity to commit fraud, Lead Plaintiffs are confident that they would be able to establish scienter. However, Lead Plaintiffs understand that a jury may disagree and find that scienter is lacking.

### 2. The Risks of Establishing Loss Causation and Damages

54.     Lead Plaintiffs also faced risks in establishing loss causation and damages. Defendants would argue forcefully that Lead Plaintiffs would be unable to demonstrate loss causation because Lead Plaintiffs would be unable to prove that the decline in the Company's stock price was related to, or proximately caused by, revelations concerning the alleged misstatements or omissions as opposed to other potential causes.

55.     In fact, the crucial element of damages would likely be reduced at trial to a "battle of experts." As a result, if this action was to continue, Defendants would challenge the damages presented by the objective damages expert and the U.S. Class's damages would be substantially reduced if Lead Plaintiffs could not prove that the alleged misrepresentations did not cause 100% of the loss. Therefore, Lead Counsel submit that where, as here, the U.S. Class will receive a substantial portion of their theoretical damages without undertaking the risk that the U.S. Class might receive a much smaller recovery, or no recovery at all, after further litigation, an analysis of this factor weighs heavily in favor of the settlement.

### C.      The Stage of the Proceedings and the Amount of Discovery Completed

56.     The stage of the proceedings and the amount of discovery completed fully supports the settlement. By the time the settlement was reached, Lead Plaintiffs and Lead Counsel had sufficient knowledge and understanding of the merits of the claims alleged in the action and the defenses that would be asserted by Defendants to determine that the settlement is in the Class's best interests. Lead Counsel obtained this knowledge by conducting an in-depth investigation, including interviews with numerous former SunOpta employees, drafting the detailed CAC, drafting a detailed mediation statement, reviewing Defendants' mediation statement, attending a mediation, consulting with damage consultants, and engaging in substantial document discovery and an interview with SunOpta's current CFO.

57.     Lead Counsel then used the information at their disposal to participate in hard-fought arm's-length settlement negotiations with Defendants. The knowledge and insight gained by Lead Plaintiffs and Lead Counsel provided Lead Plaintiffs and Lead Counsel with more than sufficient information to evaluate the strengths and weaknesses of the U.S. Class's claims and Defendants' defenses.

- 16 -

58.     It should be noted that Lead Plaintiffs – two sophisticated institutional investors who have been heavily involved in the litigation throughout its pendency – fully support the settlement and are pleased with the recovery obtained for the U.S. Class.

59.     Although Lead Plaintiffs and their expert were extremely confident that the Court would certify the U.S. Class, there is no assurance that this would be the case or that the U.S. Class would maintain its status as a class through judgment. Thus, there was a risk that the U.S. Class would not be maintained through trial.

## V.     PLAN OF ALLOCATION

60.     Pursuant to the Notice Order and as set forth in the Notice, all members of the U.S. Class who wish to participate in the distribution of the Net Settlement Fund must submit a proper Proof of Claim form. As provided in the Stipulation, after deducting all appropriate taxes, administrative costs, attorneys' fees and expenses, the remainder of the settlement fund (the "Net Settlement Fund") shall be distributed according to the Plan of Allocation.

61.     If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class Members who submit valid Proof of Claim forms. The proposed Plan of Allocation provides that to qualify for payment, a claimant must be an eligible member of the U.S. Class or the Canadian Class and must send in a Proof of Claim form that provides all of the requested information.

62.     The Plan of Allocation is set forth at pages 10-16 to Exhibit A to the Sylvester Declaration.

63.     This proposed Plan of Allocation was formulated after consultation with Lead Plaintiffs' materiality and damages experts in order to calculate a fair method to divide the Net Settlement Fund for distribution among the Class Members. The proposed Plan of Allocation

- 17 -

attempts to eliminate the effects of market forces unrelated to the alleged misrepresentations and omissions as well as simplify claims administration with attendant reduced cost to the Class. Thus, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this settlement among the Class.

## VI. FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD

64.     The Notice provides that Lead Counsel may apply for an award of attorneys' fees not to exceed 25% of 70% of the Gross Settlement Fund, or 17.5%, plus expenses of up to $150,000.00. As set forth in Lead Plaintiffs' Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Expenses, Lead Counsel are requesting fees in that amount and expenses of $106,368.48.

65.     Lead Counsel achieved this very favorable result for the U.S. Class at great risk and substantial expense to themselves. They were unwavering in their dedication to the interests of the U.S. Class and their investment of the time and resources necessary to bring this litigation to a successful conclusion. The requested fee is reasonable based on the quality of Lead Counsel's work and the substantial benefit obtained for the U.S. Class.

66.     The prosecution of this action required Lead Counsel and their paraprofessionals to perform 1,512.75 hours of work and incur $106,368.48 in expenses.

67.     The resulting lodestar totals $658,562.50. A 17.5% fee represents a 2.99 multiplier, which is well within the range of multipliers awarded in similar cases.

68.     This case was vigorously litigated and settled only after Lead Counsel had, *inter alia*: (i) drafted and filed an extensive amended complaint; (ii) consulted with experts; (iii) reviewed voluminous materials provided by Defendants; and (iv) assessed the risks of prevailing on their

- 18 -

claims at trial. These efforts and others on the part of Lead Counsel are described in detail throughout this declaration.

69.     For our extensive efforts on behalf of the U.S. Class, Lead Counsel is applying for compensation from the Gross Settlement Fund on a percentage basis, and seeks the Court's approval of the fee percentage negotiated between Lead Counsel and the Lead Plaintiffs. The percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time required under the circumstances. In addition, here the percentage method is particularly appropriate given the outstanding result and the circumstances under which it was achieved.

70.     Lead Counsel's compensation for the services rendered is wholly contingent on obtaining a favorable result for the U.S. Class. The expenses incurred in the prosecution of the litigation are set forth in the accompanying Declaration of Ellen Gusikoff Stewart and were advanced by Lead Counsel on a purely contingent basis. Lead Counsel, in seeking expenses, has declared that the expenses are reflected in the books and records it maintains and are an accurate recording of the expenses incurred. In total, Lead Counsel has incurred expenses in the amount of $106,368.48. Included in this amount are the fees paid to the consultants, investigators, and experts, all of whom provided Lead Plaintiffs and their counsel with extensive assistance during this litigation. We respectfully submit that all of these expenses are reasonable and were necessarily incurred in connection with the prosecution of this litigation.

A.      **Extent of Litigation**

71.     As described above, this case was settled only after Lead Counsel had conducted an investigation into the U.S. Class's claims, conducted extensive document discovery, thoroughly

- 19 -

researched the facts and law applicable to the U.S. Class's claims and Defendants' defenses, consulted with experts, considered the risks of continued litigation, and engaged in settlement negotiations with Defendants' counsel and Defendants' insurer, resulting in a settlement for the U.S. Class.

**B.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases**

72.    This litigation was undertaken by Lead Counsel on a wholly-contingent basis. From the outset, we understood that we were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that responsibility, we were obligated to assure that sufficient attorney and paraprofessional resources were dedicated to the prosecution of the litigation and that funds were available to compensate staff and to pay for the considerable out-of-pocket costs which a case such as this entails.

73.    Because of the nature of a contingent practice where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation. With this case having already taken several years, the financial burden on contingent fee counsel is far greater than on a firm that is paid on an ongoing basis.

74.    In addition to advancing litigation expenses and paying overhead, we faced the possibility of no recovery. It is incorrect to presume that a law firm handling complex contingent litigation always wins. Tens of thousands of hours have been expended in losing efforts. The so-called "risk of litigation" is very real in this type of case.

75.    There are numerous cases where plaintiffs' counsel in contingent cases such as this, after the expenditure of thousands of hours, have received no compensation. It is only because

defendants and their counsel know that the leading members of the plaintiffs' securities bar are prepared to, and will, force a resolution on the merits and go to trial, or pursue appeals if necessary, that meaningful settlements in actions such as this can occur.

76.     We are aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of the case or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.  Indeed, federal appellate reports are filled with opinions affirming dismissals with prejudice in securities cases.  *See, e.g.*, *Goldstein v. MCI WorldCom*, 340 F.3d 238 (5th Cir. 2003); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002); *ABC Arbitrage v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002); *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001); *Ziemba v. Cascade Int'l., Inc.*, 256 F.3d 1194 (11th Cir. 2001); *Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997); *Chill v. GE*, 101 F.3d 263 (2d Cir. 1996); *Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996); *Lovelace v. Software Spectrum*, 78 F.3d 1015 (5th Cir. 1996); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996); *Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir. 1995); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994); *Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994); *Shields v. Citytrust Bancorp.*, 25 F.3d 1124 (2d Cir. 1994); *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061 (5th Cir. 1994); *Arazie v. Mullane*, 2 F.3d 1456 (7th Cir. 1993); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993); *Raab v. Gen. Physics Corp.*, 4 F.3d 286 (4th Cir. 1993).

77.     The many appellate decisions affirming summary judgments and directed verdicts for defendants show that surviving a motion to dismiss is no guaranty of recovery. *See In re Digi Int'l, Inc. Sec. Litig.*, 14 Fed. Appx. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999); *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998); *Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997). Moreover, even plaintiffs who succeed at trial may find their judgment overturned on appeal. *See, e.g., Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (en banc) (reversing plaintiffs' verdict for securities fraud and ordering entry of judgment for defendants); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (same).

78.     Losses such as those cited above are exceedingly expensive. The fees that are awarded are used to cover enormous overhead expenses incurred during the course of the litigation and are taxed by federal, state, and local authorities. Moreover, changes in the law through legislation or judicial decree can be catastrophic, frequently affecting all of contingent fee counsel's pending cases.

79.     Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. Vigorous private enforcement of the federal securities laws and state corporation laws can occur only if private plaintiffs can obtain parity in representation with that

514139_1

available to large corporate interests. If this important public policy is to be carried out, the courts must award fees which will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

80.     Lead Counsel undertook to act for the Lead Plaintiffs and the U.S. Class in this matter, aware that they would be compensated only by obtaining a successful result. The benefits conferred on the U.S. Class by this settlement are particularly noteworthy in that an immediate cash settlement fund worth $11.25 million, plus important corporate governance reforms, was obtained for the U.S. Class.

### C.     Standing and Expertise of Lead Counsel

81.     The expertise and experience of Lead Counsel is described in the Declaration of Ellen Gusikoff Stewart submitted herewith. Lead Counsel is well-known among its peers and courts across the country as among the most experienced and skilled practitioners in the securities litigation field.

### D.     Standing and Caliber of Opposition Counsel

82.     The Defendants are represented by very experienced counsel from Jones Day and O'Melveny & Myers LLP, which possess substantial experience, expertise, and resources in the defense of complex securities litigation. In the face of this formidable opposition, Lead Counsel developed their case so as to persuade the Defendants to settle the case on a basis favorable to the U.S. Class.

## VII.     CONCLUSION

83.     For the reasons set forth above and in the accompanying Memorandum of Law in Support of Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds, and Memorandum of Law in Support of Unopposed Motion for an Award of

Attorneys' Fees and Expenses, we respectfully submit that: (a) the settlement is fair, reasonable, and adequate and should be approved; (b) the Plan of Allocation represents a fair method for distribution of the Net Settlement Fund among U.S. Class members and should also be approved; and (c) the application for attorneys' fees and expenses should be granted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Melville, New York this 5th day of April 2010.

_____
SAMUEL H. RUDMAN

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 5, 2010.

*s/ Ellen Gusikoff Stewart*
ELLEN GUSIKOFF STEWART

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail:elleng@rgrdlaw.com

# Mailing Information for a Case 1:08-cv-00933-PAC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mario Alba , Jr**
  malba@rgrdlaw.com,e_file_ny@rgrdlaw.com,drosenfeld@rgrdlaw.com

- **Torello H. Calvani**
  tcalvani@omm.com

- **Jeffrey Philip Campisi**
  jcampisi@kaplanfox.com

- **Melissa Ryan Clark**
  melissa.clark@kgscounsel.com

- **Frederic Scott Fox , Sr**
  ffox@kaplanfox.com

- **William J. Hine**
  wjhine@jonesday.com,jmsim@jonesday.com,dpjacobson@jonesday.com

- **Lewis Stephen Kahn**
  lewis.kahn@ksfcounsel.com,ecf.notices@ksfcounsel.com

- **Gregory Bradley Linkh**
  glinkh@murrayfrank.com

- **Kim Elaine Miller**
  kim.miller@ksfcounsel.com,kimmiller225@yahoo.com,ecf.notices@ksfcounsel.com

- **David Avi Rosenfeld**
  drosenfeld@csgrr.com,e_file_ny@csgrr.com

- **Samuel Howard Rudman**
  srudman@csgrr.com,e_file_ny@csgrr.com

- **David R. Scott**
  drscott@scott-scott.com,efile@scott-scott.com

- **Arthur L. Shingler , III**
  ashingler@scott-scott.com

- **Evan J. Smith**
  esmith@brodsky-smith.com

- **Ellen Anne Gusikoff Stewart**
  elleng@csgrr.com

- **William Joseph Sushon**
  wsushon@omm.com,#nymanagingattorney@omm.com

- **Jayant W. Tambe**
  dpjacobson@jonesday.com,kpollak@jonesday.com,jtambe@jonesday.com

- **Curtis Victor Trinko**
  ctrinko@trinko.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Michael J. McConnell
Jones Day(GA)
1420 Peachtree Street, Suite 800
Atlanta, GA 30309

Eric J. O'Bell
Law Offices of Eric J. O'Bell, LLC
3500 Noth Hullen Street
Metairie, LA 70002
```